521 So.2d 1018 (1987)
Harry NICKS
v.
STATE.
6 Div. 556.
Court of Criminal Appeals of Alabama.
January 27, 1987.
Rehearing Denied March 10, 1987.
*1019 C. Burton Dunn, Birmingham, for appellant.
Charles A. Graddick, Atty. Gen., and Martha Gail Ingram and William D. Little, Asst. Attys. Gen., for the State.
*1020 PATTERSON, Judge.
Appellant, Harry Nicks, was indicted on March 25, 1983, in the Bessemer Division of the Jefferson County Circuit Court, for the capital offense of murder committed during a robbery in the first degree, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. Omitting its formal parts, the indictment reads, as follows:
"The Grand Jury of said County, charges that before finding of this indictment Harry Nicks, whose name to the Grand Jury is otherwise unknown, on or about March 5, 1983, did intentionally cause the death of Robert Back, by shooting him with a pistol, and said Harry Nicks caused said death during the time that Harry Nicks was in the course of committing a theft of lawful money of the United States of America, of undetermined denominations, the property of Robert Back and Isadore Back, d/b/a Bessemer Pawn Shop, by the use of force against the person of Robert Back, with intent to overcome his physical resistance or physical power of resistance, while the said Harry Nicks was armed with a deadly weapon, to-wit: a pistol, in violation of § 13A-5-40(a)(2) of the Code of Alabama, 1975...."
At arraignment, Nicks pleaded not guilty and not guilty by reason of mental disease or defect. On May 25, 1984, a jury found him guilty of the capital offense charged in the indictment. A sentencing hearing was held before the jury in accordance with §§ 13A-5-43 through -46, Code of Alabama 1975, and the jury returned an advisory verdict recommending that the penalty be death. Ten jurors recommended the death penalty and two recommended a sentence of life imprisonment without the possibility of parole. Section 13A-5-46(f) requires that an advisory verdict recommending death be based on a vote of at least ten jurors. Thereafter, the trial court held another sentencing hearing, in accordance with §§ 13A-5-47 through -52 Code of Alabama 1975, and, after weighing the aggravating and mitigating circumstances and considering the jury's recommendation, sentenced Nicks to death.[1]
This case arises out of an incident which occurred on March 5, 1983, in the Bessemer Pawn Shop at 315 N. 19th Street, Bessemer, Alabama. The pawn shop was owned and operated by Robert and Isadore Back. At approximately 2:30 p.m., a black male entered the shop. He was wearing a red vinyl jacket, blue jeans, and a clear plastic shower cap on his head. He had acne scars on the right side of his face. He was carrying a red canvas tote bag which had a white shoulder strap. Robert Back and an employee, Debra Lynn Love, were in the shop at the time. The man approached Back and said, "Man, I need some money. I got to get out of town quick." He then pulled a pistol from the tote bag, pointed it at Back, and told Love not to move. Back took money from a cash drawer and put it in the tote bag. The robber demanded more money. He demanded "big bucks," and continuously called Back a "god damned old man" and "mother fucking old man." He threatened to kill Back and pulled a second pistol from the bag. Back took money from a second cash drawer and put it in the bag. The robber demanded more money. He wanted "big bucks" and "big bills." He ordered Love to lie on the floor and she complied. Back opened the cash drawer in the safe and handed more money to the robber and told him, "This is all I have." The robber ordered Back to lie next to Love on the floor. As Back and Love lay face down on the floor, the robber fired three shots. One shot entered the back of Love's head; one entered the back of Back's head, penetrating his brain; and one went into a rubber mat on the floor. Back either died instantly or in a matter of minutes from the bullet wound to his head; however, the bullet fired into Love's head lodged in her skull and she survived. As soon as Love heard the robber leave the shop, she telephoned the police, giving them a detailed description of the robber. *1021 Subsequently, Love identified appellant, in two lineups conducted by the police, as the person who robbed the pawn shop and shot Back and her. She also made a positive in-court identification of appellant.
Venita Bishop was working as a cashier in a nearby store on the date of the incident. She observed a black male, fitting the description of the robber, in her store around 12:30 to 12:45 p.m. Subsequently, she identified appellant, in a lineup, as the person she observed in the store where she worked on the day of the incident. She also made a positive in-court identification of appellant.
A firearms expert determined that two of the bullets fired by the robber were .22 caliber and fired from the same gun. The two pistols displayed by the robber were never found. The autopsy performed on Back's body disclosed stippling, or powder burns, around the wound to the back of his head, indicating that the pistol from which the shot was fired was very close to his head, probably within two inches.
Appellant did not testify in his own behalf during the guilt phase of the trial. He called only two witnesses: Dr. Clifford B. Hardin, a psychiatrist, and Gordon Burkhead, his landlord, in support of his insanity plea.
Two issues are raised by appellant on appeal.

I
First, appellant contends that the prosecuting attorney's reference to him, in closing argument, as a "bad guy" or a "bad person" constituted reversible error.
During closing arguments the prosecuting attorney stated, as follows:
"Now, going on to the Seymour case a little bit, I think the judge is going to instruct you that the Seymour case doesn't have anything to do with the issue of his innocence or guilt as to the capital murder case at the pawn shop. They are two distinct crimes. The reason we introduced that was not to inflame the jury that he was a bad guy, even though that he is a bad person, I think the evidence proved he is guilty of that, too. There's no question about it."
Appellant claims in brief that "the prosecutor's reference to him as a `bad person' was reversible error because this was an attempt by the State to prove bad character and the defendant had not attempted to show his good character." He relies on Cox v. State, 465 So.2d 1215 (Ala.Cr.App. 1985), and Jones v. State, 53 Ala.App. 690, 304 So.2d 34, cert. denied, 293 Ala. 761, 304 So.2d 38 (1974).
In considering this issue, as well as the following issue, it is necessary to discuss in some detail the Seymour case, referred to above by the prosecuting attorney, and particularly the part it played in the trial of this case.
The evidence introduced by the State in its case-in-chief showed that at about 12:30 p.m., on March 15, 1983, ten days after the robbery and shooting at the pawn shop, two black males entered a business known as W.B. Seymour Jewelry Company, which is one block from the pawn shop and on the same side of the street. The business was owned and operated by W.B. Seymour, who was ninety-five years of age. His daughter, Nell Russell, worked for him. She was sixty-nine. Both were present in the store on the occasion. One of the men entering the store was wearing a blue suit and the other was wearing a long-billed cap, sun goggles, and a brown or tan coat or sweater. Both of the men were carrying pistols, and the one in the blue suit was carrying a beige tote bag. One of the men stated, "This is a robbery." The robber in the brown coat took the rings from Russell's hand, after striking her on the hand with a pistol. The robber in the blue suit "threw" the tote bag on the counter, and the other man put Russell's rings into it. The robber in the blue suit approached Seymour and took Seymour's money from his pockets and the money from the cash register. While this was going on, a customer came in the store, and the customer, Russell, and Seymour were herded to the back of the store by the robber in the blue suit. This robber ordered Russell to open the safe, but she told him it could not be opened *1022 until 6:00 p.m. He then ordered Russell, Seymour, and the customer to lie on the floor. They complied; however, Seymour had difficulty getting down because of his age, and the robber hit him in the head twice with the butt of his pistol. Seymour grabbed the doorknob of the door to the beauty shop next-door, and the robber struck him on the hand with the pistol. Russell testified that, as the robber in the blue suit was doing this, he told Seymour that "if he didn't lay down he was going to kill him like he did that man up the street." She also stated that the robber warned Seymour, "old man, I'm going to kill you, get down." The people in the beauty shop next-door began yelling, "Nell and Mr. Seymour is being robbed," and the robber in the blue suit, followed by the robber in the brown coat, ran out of the store. Russell also testified that the robber in the brown coat told her that "if I didn't do what he said, they would do me like the man up the street."
The police received a report and description of a possible getaway car used by the robbers, and a search commenced. An automobile fitting the description was located in Birmingham and, as a result of this discovery, Guicy Horn was arrested. Ultimately, Horn admitted to participating in the Seymour Jewelry Company robbery and identified appellant as the other participant. Horn testified for the State at trial. His testimony generally coincided with the testimony given by Russell concerning the details of the robbery. He stated that appellant wore the blue suit and was the one that forced the victims to the back of the store and ordered them to lie down. He further testified that during the robbery, appellant told Seymour, "Well, don't make me kill you like I did the other one."
After appellant's arrest, his residence was searched, pursuant to a search warrant, and a beige tote bag containing watch parts taken in the jewelry store robbery and a blue suit were seized. Horn identified the tote bag as the one which was his and used in the robbery. He also identified the blue suit as the one worn by appellant during the robbery. Russell identified the watch parts as those taken in the robbery.
There is a multitude of reported cases concerning derogatory characterization of an accused by a prosecuting attorney in closing arguments. Examples of such cases can be found in Watson v. State, 266 Ala. 41, 44, 93 So.2d 750, 752 (1957); Barbee v. State, 395 So.2d 1128, 1134 (Ala.Cr. App.1981); and the Alabama Digest. The general rule pertaining to such comments is set out in 23A C.J.S. Criminal Law § 1102 (1961), as follows:
"Comments by the prosecuting attorney which refer to, and make unfavorable inferences from, the conduct of accused in the course of the transaction for which he is on trial, or his conduct at any other time or place, or which refer to his character as shown by such conduct, or to his background, breeding, or associations, or to other details of his personal history or characteristics are proper, where the purported facts referred to by counsel are supported by competent evidence in the case, and where the inferences and deductions sought to be made from such facts are within the bounds of proper argument. On the other hand, remarks or argument of the prosecuting attorney concerning the character or conduct of accused, which is not supported by the record or which exceeds the limits of fair argument or inference is improper.
"In a proper case, the prosecuting attorney may characterize accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence in the case, and, where the evidence warrants the belief that accused is guilty, the prosecutor may employ terms appropriate to the nature or degree of turpitude involved in the crime charged; but characterizations not justified by the evidence or the charge which the evidence tends to prove, and hence merely abusive, or which are couched in intemperate and inflammatory language are, ... improper." (Footnotes omitted.)
We also find in 23A C.J.S. Criminal Law § 1106 (1961), the following:
"While the prosecuting attorney may characterize accused or his conduct by *1023 terms of opprobrium appropriate to the facts in evidence, it is improper for him to indulge in intemperate characterization, personal abuse, vituperation, or vilification of accused, tending solely to arouse or to inflame the passion and prejudice of the jury against him, even where such comments are to some extent supported by the evidence, and, a fortiori, where they are not." (Footnotes omitted.)
And, in 3 Wharton's Criminal Procedure § 521 (C. Torcia 12th ed. 1975), it is stated, as follows;
"In his argument, counsel should enjoy the greatest latitude consistent with decorum and a sense of honor. A prosecutor's use of strong or intemperate language does not constitute error unless it is unjustified and prejudicial to the defendant. Although the characterization of defendant as a `criminal' or, in terms of the particular offense charged, as a `murderer', is improper, the impropriety is not always so prejudicial as to warrant a reversal." (Footnotes omitted.)
A reading of a sampling of the many Alabama cases on this subject clearly establishes that Alabama courts apply and follow the general principles quoted above. For examples, see Watson v. State, supra; Waldrop v. State, 459 So.2d 953 (Ala.Cr. App.1983), aff'd, 459 So.2d 959 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); Barbee v. State, supra; Liner v. State, 350 So.2d 760 (Ala. Cr.App.1977); West v. State, 54 Ala.App. 647, 312 So.2d 45 (Ala.Cr.App.), cert. denied, 294 Ala. 775, 312 So.2d 52 (Ala.1975); Braden v. State, 49 Ala.App. 97, 268 So.2d 877 (1972).
It is obvious that no fixed standard can be applied to prejudicial remarks made by counsel during the course of trial, and each case must be judged on its own merits. Smith v. State, 282 Ala. 268, 210 So.2d 826 (1968); Liner v. State, supra.
The comment of the prosecuting attorney complained of in the instant case ("The reason we introduced that [Seymour case] was not to inflame the jury that he was a bad guy, even though that he is a bad person, I think the evidence proved that he is guilty of that, too.") is unclear and, on analysis, subject to different interpretations. It could be argued that it is not a characterization of appellant as a "bad person" at all. There was no objection to the use of the term at the time, and the court did not raise the matter on its own. We believe that this indicates in this case that appellant, defense counsel, and the court did not interpret the remark as a comment on appellant's character, but rather placed little significance or importance on the comment at the time. It does not appear that the remark, in the context in which it was made, was intended to be abusive, to inflame the passion of the jury, or to be a comment on appellant's character, and we do not believe that it was or had that effect or was considered as such by the jury. It obviously was not calculated to produce a wrongful conviction. We do not think that the characterization, if it can be called such, was especially likely to stick in the minds of the jurors and influence their deliberations. Assuming that this was a characterization of appellant as a "bad person," it was not unsupported by the evidence and, while perhaps improper, was not fundamental error requiring reversal. In a proper case, the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case. Waldrop v. State, supra; Barbee v. State, supra. We are not dealing here with a case where the evidence is slight; in fact, the evidence of guilt is strong and convincing. We do not believe that error was demonstrated in this particular case.
We have previously held that such a comment, as we are dealing with here, is not a statement of fact, but merely arguendo of the prosecutor's opinion, and is generally within the limits of allowable forensic discussion. Watson v. State, supra; Liner v. State, supra.
We note that the trial court firmly admonished the jury, at the beginning of the trial and in its oral charge, that statements and arguments of the attorneys were not *1024 evidence in the case; that it was the sole judge of the facts; and that if the attorneys made a statement not supported by the evidence, the jury was to disregard it. Appellant made no objection to these instructions and did not ask for further instructions in reference to arguments of counsel. We believe that these instructions covered the alleged prejudicial argument. The statement complained of, if considered a characterization of appellant, was merely arguendo of the opinion of the prosecutor and, in light of the trial court's instructions, reversible error is not shown. West v. State, supra.
The cases upon which appellant relies can be clearly distinguished from the instant case. The case of Jones v. State, supra, did not involve arguments to the jury, but dealt with the admission of evidence. In a murder prosecution, the statement by the victim before she died, "Charles is mean", was admitted over the objection of the defendant as being a part of the res gestae. 53 Ala.App. at 694, 304 So.2d at 38. This court held that such testimony violated the principle that the character of a defendant in a criminal case is not subject to attack by the State until the defendant has shown, or attempted to show, good character, and its admission constituted reversible error. The jury heard the objectionable testimony, the objection of the defendant, and the ruling of the trial court that it was admissible. Thus, the testimony was clearly and forcefully brought to the attention of the jury and naturally was received by them as something they should consider. This is far different from a casual remark which was made by a prosecutor in closing argument and apparently was considered to be too insignificant to object to at the time or simply went unnoticed.
The case of Cox v. State, supra, does involve closing argument by a prosecuting attorney and, at first blush, appears to be very close to the instant case; however, on closer examination, the case is clearly distinguishable. During final argument, the following occurred:
"MRS. SMITHERMAN: This is a bad boy in the community.
"MR. JOHNSON: Judge, I object to this. This is improper argument.
"THE COURT: I didn't hear it.
"MR. JOHNSON: I object. She said this is a bad boy in the community. There's been no evidence whatsoever of that.
"THE COURT: Overruled.
"MR. JOHNSON: That is improper argument.
"THE COURT: Overruled.
"MR. JOHNSON: We would ask for a mistrial.
"THE COURT: Overruled.
"MR. JOHNSON: We except.
"THE COURT: Go ahead.
"MRS. SMITHERMAN: Was his theory based on the evidence, ladies and gentlemen? This boy is a bad boy in the community.
"MR. JOHNSON: Judge, I renew my objection. She's made the same statement this is a bad boy.
"THE COURT: I've already overruled it. I overruled it again. Go ahead.
"MR. JOHNSON: We except again."
465 So.2d at 1216. Unlike the instant case, this comment specifically refers to the reputation and character of the defendant in the community. The comment was repeated by the prosecutor and objection was made on each occasion. The trial court overruled the objections. Thus, the comment was clearly brought to the attention of the jury. This court reversed, holding that this was a direct attack upon the character of the defendant when the defendant had presented no evidence of his good character. The testimony in Jones and the comment in Cox, coupled with the manner in which they were presented to the jury, made it especially likely that the remarks pertaining to the defendants made an impression on the minds of the jurors and influenced their deliberations. Such is not the case here.
For the above reasons, we hold that the statement in the instant case was not so injurious as to deprive appellant of a fair trial. We find no reversible error here and, thus, no merit in this contention.

*1025 II
Appellant next contends that the trial court committed reversible error by admitting evidence of the Seymour Jewelry Company robberya crime which he allegedly committed, but was not charged with in the indictment. He moved by motion in limine prior to trial that the State be prohibited from using such evidence and objected to its introduction when it was presented at trial.
In C. Gamble, McElroy's Alabama Evidence § 69.01(1) (3d ed. 1977), the general exclusionary rule preventing evidence of crimes not charged in the indictment is stated, as follows:
"On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question. This rule is generally applicable whether the other crime was committed before or after the one for which the defendant is presently being tried.
"This exclusionary rule is simply an application of the character rule which forbids the state to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.
"The foregoing exclusionary rule does not work to exclude evidence of all prior crimes, only such as are offered to show the defendant's bad character. If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than as tending to prove guilt via bad character, then proof of such other act is admissible.
"In their mental struggles to determine whether evidence of the accused's commission of another crime is admissible, for a purpose other than as tending to show guilt via bad character, the appellate courts in numerous opinions have set forth a list of the various purposes for which evidence of the accused's commission of another crime is admissible....

"An interesting question that should be recognized at this point is whether the list of purposes for which prior crimes of the accused can be introduced is fixed. The better reasoned view would appear to be that set forth by Mr. Justice McElroy in the second edition: `However, it must not be considered that such a listing of admissible purposes was intended to be exhaustive. It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character.'" (Emphasis added, footnotes omitted.)
See also Brewer v. State, 440 So.2d 1155 (Ala.Cr.App.), cert. denied, 440 So.2d 1155 (1983); Minnifield v. State, 397 So.2d 189 (Ala.Cr.App.), cert. denied, 397 So.2d 195 (Ala.1981).
Under Alabama law, evidence of any offense other than that specifically charged is prima facie inadmissible. Allen v. State, 380 So.2d 313 (Ala.Cr.App.1979), cert. denied, 380 So.2d 341 (Ala.1980), cert. denied, 449 U.S. 842, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). However, Alabama law provides for the admissibility of evidence of collateral crimes or acts as part of the prosecution's case-in-chief if the defendant's collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty because of his past misdeeds. Brewer v. State, supra. Numerous Alabama cases list the exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted. These exceptions include the following:

*1026 "(1) Relevancy to prove physical capacity, skill, or means to commit the nowcharged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes."
Nelson v. State, 511 So.2d 225, 233 (Ala.Cr. App.1986). See also Twilley v. State, 472 So.2d 1130 (Ala.Cr.App.1985); Brewer v. State, supra; Miller v. State, 405 So.2d 41 (Ala.Cr.App.1981); Thompson v. State, 374 So.2d 377 (Ala.Cr.App.1978), aff'd, 374 So. 2d 388 (Ala.1979); McMurtrey v. State, 37 Ala.App. 656, 74 So.2d 528 (1954); Wilkins v. State, 29 Ala.App. 349, 197 So. 75, cert. denied, 240 Ala. 52, 197 So. 81 (1940); McElroy's §§ 69.01(1)-(11); Schroeder, Evidentiary Use in Criminal Cases of Collateral Crimes and Acts: A Comparison of the Federal Rules and Alabama Law, 35 Ala.L.Rev. 241 (1984). All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Noble v. State, 253 Ala. 519, 45 So.2d 857 (1950).
"All evidence is relevant which throws, or tends to throw, any light upon the guilt or the innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove, that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime, or may establish some collateral and unrelated fact. Evidence of other acts to be available must have some logical connection and reveal evidence of knowledge, design, plan, scheme, or conspiracy of the crime charged; or circumstantial evidence of identity of the person charged with the crime; or tends to corroborate direct evidence admitted."
Underhill, Criminal Evidence § 154 (3d ed. 1923). If the evidence is not so remote as to lose its relevancy, the decision to allow or not allow evidence of collateral crimes or acts as part of the State's case-in-chief rests in the sound discretion of the trial judge. McGhee v. State, 333 So.2d 865 (Ala.Cr.App.1976); McDonald v. State, 57 Ala.App. 529, 329 So.2d 583 (1975), writ quashed, 295 Ala. 410, 329 So.2d 596 (1976), cert. denied, 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99 (1976).
The theory of appellant's defense, other than insanity, was mistaken identity, i.e., he did not commit the crime charged because he was not there. Appellant's counsel stated this in his opening and closing arguments. The defense offered no evidence to support this alibi and/or mistaken identity theory; however, counsel vigorously cross-examined the State's witnesses on the identity issue in an effort to shake and discredit the identification of appellant as the perpetrator of the crime charged. He sharply questioned Love about her opportunity to observe the robber during the commission of the crime and the differences between her initial description of the robber, given to police, and the accused's actual appearance and age. He attacked the credibility of Love's lineup identification, as well as the photographic lineups. He elicited the testimony that Love had selected a picture from the photographic spread as a person that looked like the robber, and that it was a photograph of a person other than appellant. He further elicited the testimony that Love obtained a warrant at the suggestion of the police for the arrest of this person, accusing him of the crime, when it was learned that the person might leave town. He questioned Love's ability to make an accurate identification due to the surgery she had had as a result of the wound and due to the fact that she was *1027 under the treatment of a psychiatrist for the problems which arose after the incident. He also attacked her ability to make an in-court identification. He cross-examined Bishop, in reference to her identification of the robber, and highlighted the differences between her description and that of Love's. He also focused on the four artists' drawings of the suspect and the comparison of them with appellant's actual appearance and with each other. He strongly argued these points of discrepancy to the jury. He did everything he could to cast doubt upon appellant's identity as that of the robber.
Moreover, appellant's counsel stated in his closing argument to the jury, the following:
"The whole issue in this case boils down to one thing, the identification that [Love] made of Harry Nicks as the man that was in that store that day.... He's not guilty because he wasn't there. Folks, it just boils down to who are you going to believe? Are you going to believe Debra Love or believe us? We say we didn't do it."
Indeed, as appellant contends, this is the issue upon which this case turns.
The prosecuting attorney stated in final argument that evidence of the Seymour Jewelry Company robbery was offered as evidence of identity of appellant as the robber in the charged crime. Appellant's counsel stated his position to the jury, in reference to the evidence of the Seymour case, as follows:
"The judge is going to instruct you, ladies and gentlemen, that that evidence came in ... only for the purpose to identify this man as the one involved in the pawn shop and for no other purpose. They're asking youYou know the ulterior purpose behind that is to get you ladies and gentlemen to convict a man of a crime that [he] is now charged with for saying he did another crime that he is not before you on trial. Hasn't been convicted of it. Hasn't been tried by a jury like you individuals. They want you to convict him for what he supposedly did at W.B. Seymour Jewelry Store."
The trial court instructed the jury in its oral charge on how the jury should treat this evidence, as follows:
"During the course of this trial, ladies and gentlemen, evidence has been presented to you of the defendant's involvement in a subsequent offense, other than the one for which he is charged with in this indictment. And I instruct you that the evidence was introduced, or was allowed, for the limited purpose of showing scheme, plan, method of operation, and the identity of the defendant, and for that purpose only. This evidence is admitted for your consideration in regard to the defendant's guilt or innocence of the offense for which he is charged. It is not admitted for showing bad character of the defendant or his inclination or propensity to commit the type of crimes for which he is being tried."
From these instructions, it is clear that the trial court admitted the evidence of the Seymour Jewelry Company robbery under the plan, design, scheme or system, and identity exceptions to the general exclusionary rule which we have referred to above. Evidence of the accused's commission of another crime is admissible if such evidence, considered with other evidence in the case, warrants a finding that both the now-charged crime and such other crime were committed in keeping with or pursuant to a single plan, design, scheme, or system, whether narrow or broad in scope. McElroy's § 69.01(6). The identity exception contemplates the situation where the now-charged crime was committed in a novel and peculiar manner and the State is allowed to show that the accused has committed other similar offenses, in the same novel and peculiar manner, in order to show him to be the perpetrator of the nowcharged crime. McElroy's § 69.01(8).
In the instant case, there are certain similarities in the charged crime and the subsequent robbery. The crimes were committed within the same block in the middle of the day and only ten days apart. While one business was a pawn shop and one a jewelry store, they were similar in *1028 their structure, manner of doing business, and number and kind of employees present on the premises. The owners were elderly men and each had a woman employee. In each case, a tote bag was used to hold the proceeds of the robbery, and the victims were threatened with a pistol and made to lie on the floor. In each case, the owner was referred to as "old man" by the robber.
Admittedly, there are differences between the two crimes, the most obvious of which is the disposition of the respective victims. Moreover, only one robber was involved in the charged crime, and two were involved in the other crime. Different clothing was worn by the robbers, and a different color tote bag was used. However, appellant was positively identified by an eyewitness as the robber in the charged crime, and positively identified by his accomplice as one of the robbers in the other crime and, in addition, his statement that if Seymour did not lie down he would kill him like he did the man up the street, linked him directly with the crime charged. The similarities in the manner, location, and circumstances of the two crimes, coupled with the eyewitness identification of appellant as being involved in both and his admission connecting him with the charged crime, support a logical inference that appellant was the perpetrator of the charged crime. How can it be said that the actions of the person who participated with Horn in the Seymour Jewelry Company robbery in the manner and under the circumstances outlined above did not, with reason and in common knowledge and experience, point strongly toward appellant as being the person who committed the offense charged in the indictment? These considerations certainly provoke a conclusion that the evidence admitted pertaining to the subsequent crime was clearly relevant.
If the evidence of a collateral crime clearly falls within one of the exceptions to the general exclusionary rule, it should be admitted as having probative value on the issue of guilt other than as tending merely to show the accused's bad character. If there is a close question of whether the crime falls into one of these exceptions, admissibility is within the discretion of the trial court. Whitley v. State, 37 Ala.App. 107, 64 So.2d 135 (1953); McElroy's 69.02(1). In examining the issue of whether the evidence of the Seymour Jewelry Company robbery was admissible under the plan, design, scheme, or system exception or the identity exception, we find it unnecessary to make such a determination, for the evidence was clearly admissible for another reason.
In the instant case, the statement of appellant to Seymour during the Seymour Jewelry Company robbery that "if he didn't lay down he was going to kill him like he did that man up the street" constituted an admission which implicated him in the Bessemer Pawn Shop robbery and, thus, was admissible because it tended to prove his guilt of the pawn shop robbery and murder otherwise than as tending to prove guilt via bad character. It was obvious that the statement referred to the murder of the pawn shop owner, Back, and appellant does not contend otherwise. The general rule in this state relative to an accused is that the acts, declarations, and conduct of the accused, against interest, are always competent evidence. Pope v. State, 365 So.2d 369 (Ala.Cr.App.1978); Dockery v. State, 269 Ala. 564, 114 So.2d 394 (1959); Blackwell v. State, 264 Ala. 553, 88 So.2d 347 (1956). Any conduct or declaration of an accused having a relation to the offense charged, indicating a consciousness of guilt, is admissible as evidence against him. Conley v. State, 354 So.2d 1172 (Ala.Cr.App.1977).
In Dockery v. State, supra, the Alabama Supreme Court addressed an issue very similar to the one before us. In Dockery, the trial court allowed the admission of testimony in the defendant's murder trial to the effect that the defendant, during an apparent holdup or assault which was committed shortly after the murder, stated the following to the victim: "Don't move, you son-of-a-bitch. I will kill you like I did the man in Alabama." Dockery contended that the evidence of the subsequent, collateral, offense was inadmissible, for it was evidence of a separate and distinct offense. The supreme court held that the statement *1029 was admissible under the rule that the accused's acts, declarations, and conduct against interest are competent, citing Blackwell v. State, supra. The court held, "Evidence which is relevant to establish some element of the offense, or material as to some issue in the case, is not rendered inadmissible by the fact that it also tends to show another offense committed by defendant." 269 Ala. at 568, 114 So.2d at 397 (quoting Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270 (1942)). This rule is sometimes stated to the effect that, if such evidence is admissible on general grounds, it is not rendered inadmissible by the fact that it discloses offenses other than the one with which the defendant is charged; that the test of admissibility is the connection of the facts proven with the offense charged; and that, where such evidence is relevant and tends to prove the defendant's guilt, he cannot by multiplying his crimes diminish the volume of competent evidence against him. Thomas v. State, 132 Fla. 78, 181 So. 337 (1938); People v. Hall, 308 Ill. 198, 139 N.E. 123 (1923). See State v. Martin, 49 Utah 346, 164 P. 500 (1917), for a similar case where the defendant implicated himself in both the charged and collateral crimes by letters he had written. See also Ringstaff v. Commonwealth, 275 S.W.2d 946 (Ky.1955). Further, in discussing the admission of details concerning a collateral offense, the court held that proof of the circumstances attending the narration of an inculpatory statement or confession which establish the voluntary nature of such statement is admissible, and in specifically addressing the situation before it, the Dockery court noted that the statements of Dockery would hardly have made sense without the explanation of the circumstances under which they were uttered. See also Drake v. State, 257 Ala. 205, 57 So.2d 817 (1952); Tillison v. State, 248 Ala. 199, 27 So.2d 43 (1946).
In another similar case, People v. Glab, 15 Cal.App.2d 120, 59 P.2d 195 (1936), a prosecution of a wife for the murder of her husband, testimony as to the wife's participation in a brawl subsequent to the killing wherein she drew a gun and threatened to kill, stating that she had already killed one man, was held admissible as an admission to the previous killing and proved possession of a gun, notwithstanding the tendency of the testimony to prejudice the wife in the minds of the jurors. The court held, "The fact that incidentally such testimony may have involved facts as to the commission of another crime, or may have had a tendency to prejudice the accused in the minds of jurors, is no valid objection to its admission where, as here, the testimony was proper as tending to connect the accused with the crime charged." 15 Cal. App.2d at 124, 59 P.2d at 197-98.
As we have discussed above, appellant's identity as the perpetrator of the charged crime was very much in issue. The admission made during the commission of the collateral crime was relevant and competent evidence to corroborate Love's testimony and her identification of appellant and to directly prove him guilty of the offense for which he was being prosecuted. Where evidence relating to other offenses has a natural tendency to corroborate or supplement admitted direct evidence, an exception is made to the general rule excluding evidence of other offenses. Schwartz v. United States, 160 F.2d 718 (9th Cir. 1947); Hass v. United States, 31 F.2d 13 (9th Cir.1929), cert. denied, 279 U.S. 865, 49 S.Ct. 480, 73 L.Ed. 1003 (1929); Annot., 42 A.L.R.2d 854 (1955). The evidence of the collateral crime was not offered nor admitted for the purpose of showing appellant's bad character.
In readily finding that the testimony of appellant's admission was properly admitted for the jury's consideration, we further hold that the details surrounding this admission which were admitted into evidence were, although prejudicial to appellant's defense, also properly admitted. The nature of appellant's admission required that it be put in the context in which it was stated. The robbery of the jewelry store was in progress when the inculpatory admission was made. Thus, it would have been difficult for the jury to consider the import of appellant's admission and to give it the proper weight without having, for its consideration, a substantial amount of the evidence *1030 concerning the jewelry store robbery itself. In addition, some details of the circumstances of appellant's giving of the admission were relevant to insure to the jury the voluntariness of the admission. See Dockery, supra. Moreover, the details of the subsequent crime were relevant for yet another reason: A comparison of those details with the details of the charged crime presented similarities between the two crimes which were highly pertinent to the jury's consideration of the inferences of appellant's admission, i.e., whether he was referring, in his admission, to the charged crime.
Finally, the admitted details of the jewelry store robbery were properly allowed into evidence to corroborate Horn's testimony of appellant's admission. During cross-examination, appellant's counsel vigorously attacked the credibility of Horn's testimony and accused him of lying. Counsel argued to the jury that Horn's testimony was improbable and unbelievable. For example, he brought out discrepancies in Horn's description of the blue suit which Horn said appellant was wearing at the time of the jewelry store robbery. He highlighted evidence that Horn had made four statements to the police and that his first statement had been false. Horn admitted that in his first statement he had named a fictitious person, a Byron Wallace, as his accomplice and that other portions of his first statement were false. Horn admitted on crossexamination that he suspected appellant of the robbery of the pawn shop and the murder of Back and that he and his wife had discussed getting a reward. He testified that he took to appellant a copy of the local newspaper containing a story about the robbery-murder and endeavored to get appellant to discuss the crime so that he could obtain information which would enable him to turn appellant in for the reward. He stated that he had heard the reward was from $10,000 to $40,000. Horn further testified that he had pled guilty to the Seymour Jewelry Company robbery and had received a sentence of ten years. In holding that the evidence of the circumstances of the jewelry store robbery were relevant to corroborate Horn's testimony, we note that specifically the evidence seized in appellant's house connected appellant with the Seymour Jewelry Company robbery and corroborated Horn's testimony. This evidence was relevant in aiding the jury in its determination of the weight and credibility to be given Horn's testimony, particularly his testimony in reference to appellant's admission. Horn's testimony tended to corroborate the testimony of Russell and, in turn, the testimony of Russell, even though she could not identify appellant, likewise tended to corroborate Horn's testimony. As we have stated, Horn's and Russell's testimony had the natural tendency to supplement and corroborate the testimony of Love and Bishop.
In holding that the trial court's admission of the details as well as appellant's admission was not error, we do not believe that the injection of the collateral crime diverted the jury's attention from the charge being tried and the issues involved therein. There was no mini-trial or trial within a trial of the collateral crime. Moreover, the court's instructions were sufficient to apprise the jury of its responsibilities. Finally, we find that the prejudicial effect of the evidence of the collateral crime did not outweigh its probative value. Thus, we find no error in the trial court's admission of the testimony concerning the Seymour Jewelry Company robbery.
As noted, the trial judge, in his charge to the jury, instructed that appellant was not charged with the jewelry store robbery, and that the testimony tending to sustain such a charge could be considered by the jury only insofar as it might show a scheme, plan, or method of operation, or aid it in determining the identification of the person who, if any person, they might find from the evidence had committed the robbery-murder as charged in the indictment. While we have held that the evidence of the collateral crime was admissible for a reason other than that obviously contemplated by the trial court, we do not believe that the trial court's limiting instructions prejudiced appellant. A trial court will hot be placed in error for assigning the wrong reason for a proper ruling, if *1031 that ruling is correct for any reason. Bighames v. State, 440 So.2d 1231 (Ala.Cr. App.1983); Harnage v. State, 290 Ala. 142, 274 So.2d 352 (1972). By citing this rule, we do not imply that we think the evidence of the other crime was not admissible under the exceptions to the exclusionary rule referred to by the trial court in its oral charge; we simply choose not to address that issue. Rather, we prefer to bottom our decision on the admissibility of the evidence on the ground stated. The court's instructions were not conflicting, contradictory, or inconsistent. We find no prejudice in the court's instructions in this case.

III
As previously noted, appellant entered a plea of not guilty by reason of insanity along with a not guilty plea. He called only two witnesses during the guilt phase of the trial, and they were called in an effort to support his insanity plea. Due to the emphasis appellant placed on this aspect of his defense during trial and the requirement that we search the record for plain error, we have carefully reviewed the record in this regard, even though no issue is made of appellant's mental condition in his brief and argument on appeal.
Appellant called a psychiatrist, Dr. Clifford B. Hardin. Appellant had been examined prior to trial by a commission of three psychiatrists, one of whom was Dr. Hardin. Dr. Hardin testified that in his opinion, at the time of the alleged offense, appellant was not so affected with a mental disease, defect, or derangement that his ability to appreciate the criminality of his conduct could have been substantially impaired, or that appellant would have been prevented from conforming his conduct to the requirements of the law. This was the view of the commission. The testimony of Dr. Hardin did reflect that appellant had suffered from some type of mental illness in the past. The trial court found that even though there was evidence that appellant had suffered from mental disease or defect in the past, the evidence reflected that at the time of the commission of the offense, appellant had the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. We concur in this finding. Appellant completely failed to establish a lack of criminal responsibility. Shorts v. State, 412 So.2d 830 (Ala.Cr.App.1981); Ala.Code § 13A-3-1 (1975).

IV
The scope of our review in death cases is set out in A.R.A.P. 45A, as follows:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the appellant."
We have examined the instant record for any plain error, whether or not brought to our attention or the attention of the trial court. We have found no "plain error or defect in the proceedings," either in the guilt phase or in the sentencing phase of the trial.
We have also followed the requirements of Beck v. State, 396 So.2d 645 (Ala. 1980). Beck, requires the following three-tiered analysis in death cases: (1) Whether the crime was punishable by death; (2) Whether similar crimes are being punished capitally throughout the State; and (3) Whether the death sentence is appropriate in relation to the defendant. In reviewing appellant's death sentence by this three-tiered analysis, we make the following findings: First, Nicks was convicted of murder during a robbery in the first degree, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. The offense is by statutory definition a capital offense. Second, we take judicial notice that similar crimes are being punished capitally throughout Alabama. See, e.g., Thomas v. State, 460 So.2d 207 (Ala.Cr.App.1983), aff'd, 460 So.2d 216 (Ala.1984); Waldrop v. State, 459 So.2d 953 (Ala.Cr.App.1983), aff'd, 459 So.2d 959 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); Weeks v. *1032 State, 456 So.2d 395 (Ala.Cr.App.1983), aff'd, 456 So.2d 404 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324 (1985); Luke v. State, 444 So.2d 393 (Ala.Cr.App.), aff'd, 444 So.2d 400 (Ala. 1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); Womack v. State, 435 So.2d 766 (Ala.1983), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed. 2d 367 (1983); Coulter v. State, 438 So.2d 336 (Ala.Cr.App.1982), aff'd, 438 So.2d 352 (Ala.1983); Bush v. State, 431 So.2d 555 (Ala.Cr.App.1982), aff'd, 431 So.2d 563 (Ala.1983). See also Beck v. State, 396 So.2d 645, n. 5 (Ala.1981) (opinion after remand, as modified on denial of rehearing);[2] Colquitt, The Death Penalty Laws of Alabama, 33 Ala.L.Rev. 213, 225 (1982). Two-thirds of the death sentences imposed in Alabama are in cases of robbery-murder. Thomas v. State, 460 So.2d at 225. In regard to the third determination, Beck requires us to examine the penalty imposed upon the defendant in relation to that imposed upon his accomplice, if any. We note that there were no accomplices or co-defendants in the instant case. Finally, our independent weighing of the aggravating and mitigating circumstances convinces us that the sentence of death is appropriate in relation to this defendant.
After appellant was convicted of the capital offense charged, a separate sentence hearing was held before the jury in accordance with § 13A-5-46. After hearing evidence concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of aggravating and mitigating circumstances, if any, the weighing of same, if appropriate, and its responsibility in reference to the return of an advisory verdict; the jury returned the following verdict: "We the jury recommend to the trial court that the penalty be death." Ten of the jurors voted to recommend the death penalty and two voted to recommend life imprisonment without the possibility of parole.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, to aid it in determining whether or not it would sentence appellant to death as recommended by the jury or to life imprisonment without the possibility of parole. The trial court ordered and received a written pre-sentence investigation report as required. Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or non-existence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51 and § 13A-5-52, as well as written findings of fact summarizing the crime and appellant's participation in it. In its findings of fact (see "Appendix" attached hereto and made a part of this opinion), the trial court found the existence of the following aggravating circumstances: Appellant was previously convicted of a felony involving the use or threat of violence to the person, and the capital offense for which appellant stands convicted was committed while he was engaged in the commission of a robbery. (This latter aggravating circumstance is encompassed within the capital offense alleged in the indictment.) Ala. Code §§ 13A-5-49(2); -49(4); and -40(a)(2) (1975). The trial court found from the evidence the following:
"On March 5, 1983 at approximately 2:30 P.M. the defendant, Harry Nicks, entered the Bessemer Pawn Shop, 315 No. 19th Street, Bessemer, Alabama. At that time the business was being operated by Robert Back, a co-owner and Debra Love his employee. Upon entering the business the defendant presented a pistol, demanded the money from Mr. Back and told Ms. Love not to move. Mr. Back gave the defendant the money from the cash drawer. When the defendant demanded more money, Mr. Back complied and gave him money from the safe. Nicks then ordered Mr. Back and Ms. Love to lie down on the floor. With both victims lying helplessly on the floor, *1033 Harry Nicks intentionally shot both in the head with a pistol. Mr. Back died as a result of his wounds and Ms. Love was seriously injured."
The trial court examined the evidence for mitigating circumstances pursuant to the requirements of §§ 13A-5-51 and -52, and found that no mitigating circumstances existed.
Thus, the trial court found the existence of two aggravating circumstances and no mitigating circumstances. It weighed the aggravating circumstances, while noting the absence of mitigating circumstances, and, finding the aggravating circumstances sufficient to support the sentence of death recommended by the jury, sentenced appellant to death.
We find that the findings and conclusions of the trial court are strongly supported by the evidence. We concur in the verdict of the jury and the findings of the trial court that death is the appropriate sentence in this case. Nicks deliberately executed Back and attempted to execute Love in an obvious effort to prevent his identification and prosecution for the robbery he had committed.
We also review appellant's sentence by the provisions of § 13A-5-53, Code of Alabama 1975. Our findings above fully comply with § 13A-5-53(a). In compliance with § 13A-5-53(b), we find the following:
(1) There is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) based on our independent weighing of the aggravating and mitigating circumstances, the sentence of death is appropriate in this case; and (3) considering the crime committed and the defendant, the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases.
We have carefully searched the record in both the guilt and sentence phases of appellant's trial, and we have found no error. Accordingly, appellant's conviction and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
BOWEN, TAYLOR and McMILLAN, JJ., concur.
TYSON, J., concurs specially.

APPENDIX

IN THE CIRCUIT COURT OF JEFFERSON COUNTY TENTH JUDICIAL CIRCUIT

BESSEMER DIVISION

CASE NO. CC 83-350

FINDING OF FACTS
In accordance with Section 13-A-5-47(d) Alabama Criminal Code, the Court makes the following findings of facts summarizing this crime and the defendant's participation in it and specific findings as to the existence or non-existence of aggravating and mitigating circumstances:
On March 5, 1983 at approximately 2:30 P.M. the defendant, Harry Nicks, entered the Bessemer Pawn Shop, 315 No. 19th Street, Bessemer, Alabama. At that time the business was being operated by Robert Back, a co-owner and Debra Love his employee. Upon entering the business the defendant presented a pistol, demanded the money from Mr. Back and told Ms. Love not to move. Mr. Back gave the defendant the money from the cash drawer. When the defendant demanded more money, Mr. Back complied and gave him money from the safe. Nicks then ordered Mr. Back and Ms. Love to lie down on the floor. With both victims lying helplessly on the floor, Harry Nicks intentionally shot both in the head with a pistol. Mr. Back died as a result of his wounds and Ms. Love was seriously injured.
The Court makes the following findings concerning the existence or non-existence of the aggravating factors enumerated in Section 13A-5-49:
13A-5-49 (1) The defendant was not under sentence of imprisonment.
(2) The defendant was previously convicted of another felony involving the use of threat of violence to the person in that he was previously convicted of assaulting a person and putting in jeopardy the life of a *1034 person by the use of a dangerous weapon (T. 18, U.S.C., Sec. 2113(d)).
(3) The capital offense was not committed under circumstances creating a great risk of death to many persons.
(4) The capital offense was committed with the defendant was engaged in the commission of robbery.
(5) The capital offense was not committed for the purpose of avoiding or preventinga lawful arrest or effecting an escape from custody.
(6) The capital offense was not committed for pecuniary gain.
(7) The capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
(8) The capital offense was not especially heinous, atrocious or cruel compared to other capital offenses.
The Court makes the following findings concerning the existence or non-existence of the mitigating factors enumerated in Section 13A-5-51 or any additional mitigating circumstances offered pursuant to Section 13A-5-52:
13A-5-51 (1) The defendant does have a significant history of prior criminal activity.
(2) The capital offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance.
(3) The victim was not a participant in the defendant's conduct nor did he consent to it.
(4) The defendant was the principal and sole perpetrator of this capital offense.
(5) The defendant did not act under extreme duress nor was he under the substantial domination of another person.
(6) While the evidence in this case reflects that the defendant has suffered from mental disease and/or defect in the past, the evidence further reflects that at the time of the commission of this offense the capacity of the defendant to appreciate the criminality of his to the requirements of law was not substantially impaired.
(7) The age of the defendant at the time of the crime was 32 years old and is not a mitigating factor.
13A-5-52 Upon consideration of the evidence the Court does not find any un-enumerated mitigating circumstances.
The Court finds two aggravating circumstances to exist and finds no mitigating circumstances. The Court finds that the aggravating circumstances and the jury recommendation that the defendant be sentence to death outweighs the mitigating circumstances. In making this evaluation the Court did not merely tally and numerically compare these factors but used this process to marshal and organize these factors relevant to sentencing. After consideration of all these factors, it is the finding of the Court that the proper sentence in this case is death.
The defendant is adjudged guilty of the capital offense and being asked if he had anything to say why the judgment of the Court and sentence of the law should not be pronounced upon [him] says, "I know one thing, I am not guilty. I didn't commit no kind of act".
It is the judgment of the Court and the sentence of the law that the defendant, Harry Nicks, suffer death by electrocution on the 10th day of October, 1984 and the Sheriff of Jefferson County, Alabama is directed to deliver the defendant to the custody of the Department of Corrections and Institutions at Montgomery, Alabama and the designated executioner shall, at the proper place for the execution of one sentenced to suffer death by electrocution cause a current of electricity of sufficient intensity to cause death and the application and continuance of such current to pass through the body of the defendant, Harry Nicks, until he is dead.
DONE and ORDERED this the 2nd day of August, 1984.
/s/Dan Reynolds
SENIOR CIRCUIT JUDGE
TYSON, Judge, concurring specially.
At first blush I confess to certain misgivings with reference to the evidence of the *1035 Seymour Jewelry Company robbery which was admitted at trial of this appellant as evidence of the appellant's identity in the "charged crime".
There is considerable discussion in the majority opinion under Issue II and cases cited to support the admission of this evidence both as evidence of identity and, also, evidence admitted with reference to the pursuit of a plan, design, scheme or system. All of this is fully discussed in the majority opinion.
I find in reviewing the authorities cited in the majority opinion which support this position that, in addition thereto, this court has admitted such evidence as an exception to the general rule of Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953) (42 A.L.R.2d 847) in homicide cases to establish motive and intent.
Two such cases are Hardy v. State, 51 Ala.App. 489, 286 So.2d 899 (1973) and Bynum v. State, 348 So.2d 804 (Ala.Crim.App. 1976), cert. quashed, 348 So.2d 828 (Ala. 1977).
Based on my review of the cases herein cited and in the majority opinion, I am of the opinion that the trial court correctly admitted the evidence with reference to the comment alleged to have been made by this appellant in the Seymour Jewelry Company robbery.
I, therefore, join in the affirmance in this cause.
NOTES
[1] The trial court's sentencing order setting out written findings as to aggravating and mitigating circumstances, and written findings of fact summarizing the crime and appellant's participation in it is attached hereto, made a part of this opinion, and marked "Appendix".
[2] A listing of convictions for which a sentence of death was imposed under Alabama's death penalty statute. In Beck the Alabama Supreme Court noted that, of the fifty cases it studied, thirty-three were robbery-intentional killing cases.