[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 963 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 964 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 965 
The appellant, Eugene Milton Clemons II, was charged with two counts of murder made capital because the victim was a law enforcement officer who was killed in the line of duty and the murder occurred during the course of a robbery. See §§ 13A-5-40(a)(5) and 13A-5-40(a)(2), Code of Alabama 1975. The appellant was convicted of the capital offense of murder during the course of a robbery. § 13A-5-40(a)(2). The jury unanimously recommended that the appellant be sentenced to death. The trial court accepted the jury's recommendation and sentenced the appellant to death by electrocution.
The state's evidence tended to show that on May 28, 1992, Douglas Althouse, a special agent with the Drug Enforcement Administration (D.E.A.), was shot and killed while the appellant and his codefendant stole the automobile in which he was a passenger. Dr. Joseph Embry, state medical examiner, testified that Althouse was shot twice and that the fatal bullet entered the left side of his chest and passed through his heart.
Naylor Braswell of the Jefferson County Sheriff's Department testified that the victim and he were sharing an apartment at the time of the murder. Braswell testified that on May 28 at approximately 10:00 p.m., he and Althouse left the apartment in Braswell's black Camaro automobile, to meet a narcotics officer. Braswell pulled into a service station/convenience store to borrow the telephone book to make a call on his cellular telephone. While he was in the store he noticed that a stocky black male had gotten into his car and was sitting behind the steering wheel, armed with a revolver. At trial, Braswell testified that the appellant looked like the man he saw in his car. He heard two muffled shots, saw Althouse dive out of the car, and saw Althouse shooting at the car. He ran out to Althouse as he collapsed from his injuries. Braswell testified that a bulletproof vest and a shotgun were in the trunk of the car when it was stolen.
Kenny Reed testified that he was at Herman Shannon's house on May 28 when Dedrick Smith stopped by and asked Reed to pick up the appellant to go get "a car." He testified that they picked up the appellant and drove to an area near a service station where the appellant got out of the car. Reed stated that he heard several shots, that there was a break in the shooting, followed by several more shots. The appellant then drove off in a black Camaro automobile and later went to Shannon's house. When Reed arrived at Shannon's house, the appellant said that no one better "open their mouths" because he had just killed a D.E.A. man. He further testified that the week before the murder, the appellant had told him that his car needed a new motor.
Early the next morning following the murder, the stolen Camaro was discovered near Shannon's house. The shotgun in the trunk of the car was recovered on the side of the road near the appellant's house.
Clemons was arrested by Federal Bureau of Investigation (F.B.I.) agents in Cleveland, Ohio. Michael Clemons, the appellant's uncle, who lived in Cleveland, testified that the appellant's sister telephoned him and told *Page 966 
him that the appellant would be coming to his house. Michael Clemons testified that he met with the appellant's father and they subsequently met and talked with the appellant. Michael Clemons further stated that the appellant said that he had to shoot a police officer because the officer was trying to kill him and that he had to steal the car to get away.
The appellant raises numerous issues on appeal, some of which have not been preserved by way of objection. Because the appellant was sentenced to death, this court is obliged by Rule 45A, Ala.R.App.P., to search the record for any error that adversely affected the appellant's substantial rights.
Rule 45A, Ala.R.App.P., states:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Thus, even if no objection was made at trial, this court will review the issue under the plain error doctrine. "While the fact that no objection was made will not preclude review in a case where the appellant has been sentenced to death, it will weigh against any claim of prejudice." Williams v. State,601 So.2d 1062, 1072 (Ala.Cr.App. 1991), aff'd, 662 So.2d 929, (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417,121 L.Ed.2d 340 (1992). See also Dill v. State, 600 So.2d 343
(Ala.Cr.App. 1991), aff'd, 600 So.2d 372, (Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993);Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886,112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
 I
Initially, the appellant contends that the trial court erred in denying his motion to dismiss the charges against him because, he says, his constitutional protection against being tried twice for the same offense was violated. The appellant was tried and convicted in federal court for the murder of Althouse. He contends that he was subjected to double jeopardy when he was tried and convicted in the State of Alabama for the same murder.
Article I, § 9, of the Alabama Constitution of 1901 states:
 "That no person shall, for the same offense, be twice put in jeopardy of life or limb; but courts may, for reasons fixed by law, discharge juries from the consideration of any case, and no person shall gain an advantage by reason of such discharge of the jury."
Amendment V of the Constitution of the United States states:
 "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."
The United States Supreme Court resolved this issue inHeath v. Alabama, 474 U.S. 82, 106 S.Ct. 433,88 L.Ed.2d 387 (1985). The United States Supreme Court, applying the "dual sovereignty" doctrine, stated the following:
 "The sole remaining question upon which we granted certiorari is whether the dual sovereignty doctrine permits successive prosecutions under the laws of different States which otherwise would be held to `subject [the defendant] for the same offense to be twice put in jeopardy.' U.S. Const., Amdt. 5. Although we have not previously so held, we believe the answer to this query is inescapable. The dual sovereignty doctrine, as originally articulated and consistently applied by this Court, compels the conclusion that successive prosecutions by two States for the *Page 967 
same conduct are not barred by the Double Jeopardy Clause.
 "The dual sovereignty doctrine is founded on the common-law conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the `peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct `offences.' United States v. Lanza, 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922). As the Court explained in Moore v. Illinois, 14 How. 13, 19, 14 L.Ed. 306 (1852), `[a]n offence, in its legal signification, means the transgression of a law.' Consequently, when the same act transgresses the laws of two sovereigns, `it cannot be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which he is justly punishable.' Id., at 20.
 "In applying the dual sovereignty doctrine, then, the crucial determination is whether the two entitles that seek successively to prosecute a defendant for the same course of conduct can be termed separate sovereigns. This determination turns on whether the two entities draw their authority to punish the offender from distinct sources of power. See, e.g., United States v. Wheeler, 435 U.S. 313, 320, 98 S.Ct. 1079, 1084, 55 L.Ed.2d 303 (1978); Waller v. Florida, 397 U.S. 387, 393, 90 S.Ct. 1184, 1187, 25 L.Ed.2d 435 (1970); Puerto Rico v. Shell Co., 302 U.S. 253, 264-265, 58 S.Ct. 167, 172-73, 82 L.Ed. 235 (1937); Lanza, supra, 260 U.S., at 382, 43 S.Ct., at 142; Grafton v. United States, 206 U.S. 333, 354-355, 27 S.Ct. 749, 755, 51 L.Ed. 1084 (1907). Thus, the Court has uniformly held that the States are separate sovereigns with respect to the Federal Government because each State's power to prosecute is derived from its own `inherent sovereignty,' not from the Federal Government. Wheeler, supra, at 320, n. 14, 98 S.Ct., at 1084, n. 14. See Abbate v. United States, 359 U.S. 187, 193-194
[79 S.Ct. 666, 669-70, 3 L.Ed.2d 729] (1959) (collecting cases); Lanza, supra. As stated in Lanza, supra, 260 U.S., at 382 [43 S.Ct., at 142]:
 "`[E]ach government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other.
 "`It follows that an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each.'
 "See also Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); Westfall v. United States, 274 U.S. 256, 258, 47 S.Ct. 629, 629, 71 L.Ed. 1036 (1927) (Holmes, J.) (the proposition that the State and Federal Governments may punish the same conduct `is too plain to need more than statement').
 "The States are no less sovereign with respect to each other than they are with respect to the Federal Government. Their powers to undertake criminal prosecutions derive from separate and independent sources of power and authority originally belonging to them before admission to the Union and preserved to them by the Tenth Amendment. See Lanza, supra, 260 U.S., at 382, 43 S.Ct., at 142. The States are equal to each other `in power, dignity and authority, each competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself.' Coyle v. Oklahoma, 221 U.S. 559, 567, 31 S.Ct. 688, 690, 55 L.Ed. 853 (1911). See Skiriotes v. Florida, 313 U.S. 69, 77, 61 S.Ct. 924, 929, 85 L.Ed. 1193 (1941). Thus, `[e]ach has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses, and in doing so each "is exercising its own sovereignty, not that of the other."' Wheeler, supra, 435 U.S., at 320, 98 S.Ct., at 1084 (quoting Lanza, supra, 260 U.S., at 382, 43 S.Ct., at 142)."
474 U.S. at 88-90, 106 S.Ct. at 437-38, 88 L.Ed.2d at 392-93.
The appellant contends that § 15-3-8, Code of Alabama 1975, forbids his prosecution in state court and federal court for the same crime. This section states: *Page 968 
 "Any act or omission declared criminal and punishable in different ways by different provisions of law shall be punished only under one of such provisions, and a conviction or acquittal under any one shall bar a prosecution for the same act or omission under any other provision."
This statute was in The 1923 Code of Alabama, seventy-two years before the United States Supreme Court's decision in Heathv. Alabama, a case originally before this Court inHeath v. State, 455 So.2d 898 (Ala.Cr.App. 1983), aff'd,455 So.2d 905 (Ala. 1984), aff'd, 474 U.S. 82, 106 S.Ct. 433,88 L.Ed.2d 387 (1985). This section has no application to prosecutions commenced by the federal government but applies to prosecutions commenced by the State of Alabama.
In State v. Petty, 201 Wis.2d 337, 548 N.W.2d 817
(1996), the Wisconsin Supreme Court had occasion to address a Wisconsin statute that limited dual prosecutions by state and federal authorities. The statute considered by the court inPetty reads as follows:
 "Bar to prosecution: If a violation of this chapter is a violation of a federal law or the law of another state, a conviction or acquittal under federal law or the law of another state for the same act is a bar to prosecution in this state."
Wis. Stat. § 161.45. The Court in Petty stated:
 "[A] number of states, focusing upon the individual's interest in being free from repeated prosecutions for the same alleged acts, have enacted legislation aimed at alleviating continued prosecution, depending upon the similarity of the state and federal charges and upon whether the state and federal laws were designed to protect the same governmental interests. See generally, Annotation, Conviction Or Acquittal In Federal Court As Bar To Prosecution In State Court For State Offense Based On Same Facts
— Modern View, 6 A.L.R.4th 802, 816-24 (1981). Section 161.45 is representative of the type of legislation instituted by those jurisdictions precluding continuing prosecution, as permitted under the doctrine of dual sovereignty."
548 N.W.2d at 825. If the legislature of this state had intended to limit dual prosecutions by federal and state courts it could have enacted a statute similar to the Wisconsin statute.
No violation of the appellant's constitutional protection against double jeopardy occurred here. See also People v.Mezy, 453 Mich. 269, 551 N.W.2d 389 (1996); State v.Wyche, 914 S.W.2d 558 (Tenn.Cr.App. 1995); In reForfeiture of $109,901, 210 Mich.App. 191, 533 N.W.2d 328
(1995).
We note that the appellant was convicted in federal court of murdering a law enforcement officer in the line of duty. In Alabama the count charging the appellant with the murder of a police officer was dismissed before the case was submitted to the jury and the appellant was convicted of murder during the course of a robbery. Because the State of Alabama's prosecution of the appellant does not violate principles of double jeopardy, the State was not barred from seeking the death penalty.Heath v. State, 536 So.2d 142 (Ala.Cr.App. 1988).
 II
The appellant next contends that the trial court erred in failing to dismiss the indictment against him because capital punishment is cruel and unusual.
Capital punishment has repeatedly been upheld against constitutional attacks. As we stated in Tarver v.State, 553 So.2d 631, 632 (Ala.Cr.App.), aff'd,553 So.2d 633 (Ala. 1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1837,108 L.Ed.2d 966 (1990):
 "The appellant argues that Alabama's capital punishment statute violates the fifth and fourteenth amendments to the United States Constitution. Specifically, he argues that this capital punishment statute constitutes cruel and unusual punishment because, he says, it does not provide proper standards and safeguards to insure that the death penalty is not inflicted arbitrarily. However, this argument has also been previously addressed and rejected. Thompson v. State, 542 So.2d 1286 (Ala.Cr.App. 1988). See also Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)." *Page 969 
In Hubbard v. State, 584 So.2d 895, 912
(Ala.Cr.App. 1991), cert. denied, 502 U.S. 1041, 112 S.Ct. 896,116 L.Ed.2d 798 (1992), we stated: "The United States Supreme Court has already ruled that capital punishment is constitutional. E.g., Gregg v. Georgia, 428 U.S. 153,96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Proffitt v.Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913
(1976)," and in State v. Tarver, 629 So.2d 14
(Ala.Cr.App. 1993), we reiterated: "The death penalty has on many occasions withstood constitutional attacks on this ground [i.e. that it constitutes cruel and unusual punishment]." See also Harrell v. State, 470 So.2d 1303 (Ala.Cr.App. 1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935,106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
 III
The appellant, who was 20 years old at the time of the offense, contends that the trial court abused its discretion in denying his application for youthful offender status. See § 15-19-1. Specifically, the appellant contends that the trial court, in denying his application for youthful offender status, failed to consider the sentence of life imprisonment without parole imposed by the federal court and erred in considering two prior youthful offender guilty pleas.
Initially, we observe that there was no objection presented to the trial court as to these matters. Thus, our review of this issue will be under the plain error doctrine. Rule 45A, Ala.R.App.P.
On numerous occasions this Court has stated that the Youthful Offender Act, § 15-19-1, et. seq., vests in the trial judge great discretion in granting or denying youthful offender status after an appropriate investigation. Goolsby v. State,492 So.2d 635 (Ala.Cr.App. 1986); Hart v. State,612 So.2d 520 (Ala.Cr.App.), aff'd, 612 So.2d 536 (Ala. 1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993). This court will reverse a trial court's decision only if it is "arbitrary or made without some examination or investigation of the youthful offender." Burks v. State, 600 So.2d 374,379 (Ala.Cr.App. 1991). The trial court is required to make
 "such investigation and examination of the defendant as is sufficient to enable the judge to make an intelligent determination of whether, in his discretion, the defendant is eligible to be treated as a youthful offender, rather than being tried, and if found guilty, sentenced in the normal criminal process."
Clemmons v. State, 294 Ala. 746, 749, 321 So.2d 238,241 (1975).
"When deciding whether to grant youthful offender status, it is expected that the nature of the crime charged, along with prior convictions of the defendant, will be considered, as well as any other matters deemed relevant by the court." Goolsby,492 So.2d at 636. The trial judge should not rely solely on the nature or type of crime with which the accused is charged; however, the trial judge should consider the manner in which the crime was committed. Burks, 600 So.2d at 379.
In the present case, the trial court held a hearing at which Ann Watson, the probation officer who prepared the appellant's probation report, testified. Officer Watson testified that it was her opinion that the appellant's application for youthful offender status should be denied based on her interviews with the appellant. The report detailed the nature and circumstances surrounding Althouse's murder and the appellant's prior arrests for possession of marijuana and robbery in the first degree. The trial court also considered the fact that the present offense was committed with a firearm.
The appellant contends that his federal sentence should have been taken into consideration. Also, the appellant contends that the trial court should not have taken his two prior arrests into consideration. As to the federal sentence issue, we agree with the State's assertion that the federal sentence is "wholly unrelated to his trial and [is] irrelevant to the trial court's decision whether to grant or deny youthful offender status." However, the two prior arrests are completely relevant in deciding whether to grant or deny the application. SeePardue v. State, 566 So.2d 502, 505 (Ala.Cr.App. 1990).
The record furnishes no reason to reverse the trial court's ruling on this issue. *Page 970 
 IV
The appellant contends that he was denied his constitutional right to a public trial because the trial court excluded his grandmother from the courtroom until she was released from a subpoena issued by the district attorney's office. Specifically, he contends that the state used the power of the subpoena to exclude his grandmother and other family members from the courtroom. He also contends that the trial court erred by excluding spectators from the courtroom.
These issues stem from the following disruption during the trial, as a result of which the judge was forced to exclude certain individuals from the courtroom:
 "THE COURT: Which one of y'all knocked on the door just now?
 "A SPECTATOR: Why can we not come in the courtroom?
 "THE COURT: I'm asking you which one of you knocked on the door.
 "A SPECTATOR: Not I.
 "A SHERIFF'S DEPUTY: Your Honor, it was the lady standing in front of the bench that was closest to the door when I opened the door.
 "A SPECTATOR: Just because I was in front of it does not mean I knocked on the door.
 "THE COURT: Did y'all see who knocked on the door?
 "(Off-the-record discussion.)
 "THE COURT: Ma'am, I'm ordering you to be quiet right now.
 "A SPECTATOR: May I have a word? "THE COURT: Not at this time.
 "A SPECTATOR: Well, I just —
 "THE COURT: Ma'am, you say one more word out of any of you —
 "(Off-the-record discussion.)
 "THE COURT: I'm going to order that the four individuals that have been subpoenaed in this trial, that they do not remain on the outside of this room out here, that they remain in some other area of the building, to not be disruptive. You know, they knocked on the door or somebody did a while ago. And I understand that it was one of the two of the individuals that are in this group. And I understand there has been some disruption.
 "I do not want anyone out here on the outside of this courtroom, on the outside, out in the hallway, no one other than people that are involved in the security. And I had mentioned earlier that people — this is a public trial, you are under a subpoena is the problem. And once you are no longer under subpoena then you are free to stay in here because this is a public trial. And anybody can come in here that so wishes. But the problem is that witnesses or potential witnesses are not allowed to be in here. And I understand — my understanding happens to be that all four of y'all have been subpoenaed.
 "A SPECTATOR: No we're not. I'm not under subpoena.
 "THE COURT: But whoever is subpoenaed cannot be in here. As far as the people coming in the courtroom after recess, they cannot do it, the door is locked and they can't come in here. You can come in here if you are not subpoenaed and as I mentioned, if you're relatives of the defendant you can sit over here to the right.
 "MR. HILLMAN [Bailiff]: Judge, she has been served with a subpoena and she threw it in the floor out in the hallway. "THE COURT: Well, anyone that has not been subpoenaed has the opportunity to sit over here. But I lay down a rule from the very outset, I'm not sure who was in here that heard this, but it's the fact that you cannot make any facial gestures and you cannot talk and I won't tolerate it whenever that trial is going on.
 "But whoever is subpoenaed has to remain outside of the courtroom. And I'm going to order that no one remains outside out in the hallway other than the people that are involved in security in this case. "A SPECTATOR: Excuse me, sir. If I was subpoenaed where is my subpoena? And if somebody wanted to subpoena me, why did they throw it at me?
 "THE COURT: I don't know. If you've been subpoenaed you are not to attend this court proceeding. *Page 971 
 "A SPECTATOR: I haven't been subpoenaed because my name is not Clemons. "MR. JOHNSON [Defense Counsel]: Your Honor, may I request that at least with respect to Ms. Barron, the grandmother of this defendant, that she be excused from the Rule? I do not think Ms. Barron — I think she would have a good effect on the conduct of the defendant and I think that the defendant needs and is entitled to at least have at least that much.
 "MR. OWENS [Prosecutor]: Judge, with regard to Ms. Barron, except for the next witness we would consent to that and agree she can be present and assist counsel on defendant's behalf.
 "THE COURT: Okay. If she's been subpoenaed she will not be permitted to stay in here. She will be whenever the State releases her from the subpoena, though. Okay. That's my order."
There were no objections at trial regarding this issue: thus, we must review this issue using the plain error doctrine. Rule 45A, Ala.R.App.P.
Regarding the appellant's claim that the trial court erred by excluding his grandmother and others who were under subpoena to testify as witnesses, we disagree. "The general rule in Alabama is that the invocation and enforcement of the rule of exclusion of witnesses is a matter within the sound discretion of the trial court." Chatman v. State, 380 So.2d 351, 353
(Ala.Cr.App. 1980). Furthermore, Rule 9.3(a), Ala.R.Crim.P. states that "the Court . . . may exclude witnesses from the courtroom and direct them not to communicate with each other . . . concerning any testimony until all witnesses have been released by the court."
 "The purpose of the witness sequestration rule is to prevent any one witness from hearing the testimony of other witnesses and perhaps perceiving the value of his own testimony to one party or the other. Obviously, if witnesses are sequestered, they are not able `to strengthen or color their own testimony, or to testify to greater advantage in line with their bias, or to have their memories refreshed — sometimes unduly — by hearing the testimony of other witnesses.' Louisville Nashville R.R. Co. v. York, 128 Ala. 305, 310, 30 So. 676, 678
(1901)."
Ex parte Faircloth, 471 So.2d 493, 496 (Ala. 1985).
The appellant has not shown that he was prejudiced by the absence of these individuals from the courtroom. The exclusion of these witnesses comported with the rules. Further, there is no evidence in the record that the state used its subpoena power purposefully to exclude these people from the courtroom.
Nor did the trial court err by prohibiting spectators from entering the courtroom. While the accused does have a right to a public trial,
 "[t]he constitutional right to a public trial is not limitless. Weatherford v. State, 369 So.2d 863 (Ala.Crim.App.), cert. denied, 369 So.2d 873 (Ala.), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91 (1979). `The requirement of a public trial "is not absolute in the sense that a defendant has the right to have any particular person present under all circumstances during the course of the trial."' Id. at 868 (quoting United States ex rel. Laws v. Yeager, 448 F.2d 74, 80
(3d Cir. 1971)). `It is generally recognized that a judge has the inherent power to preserve order and decorum in the courtroom and that in the exercise of such power he may eject spectators without infringing an accused's right to a public trial.' Id.
at 868. An order to lock the door for such an interval as to prevent disruption in the courtroom is properly a matter for the trial court's discretion and does not prevent a public trial in the sense of constitutional requirements. Renfroe v. State, 49 Ala.App. 713, 275 So.2d 692 (1973); Bishop v. State, 19 Ala.App. 326, 97 So. 169 (1923)."
Davidson v. State, 591 So.2d 901, 902-3
(Ala.Cr.App. 1991).
The above quoted portion of the record shows clearly that the judge closed the courtroom to preserve order and decorum. The record shows that the trial judge ordered the doors to be locked only after certain individuals were causing disruptions in the trial. *Page 972 
The judge acknowledged that the trial was a public one and that anyone not scheduled to appear as a witness was entitled to attend; however, he ordered the doors to be locked because the trial was being interrupted by disruptions. The appellant was not denied his right to a public trial.
 V
The appellant contends that the trial court erred in denying his motion to quash the jury venire based on an allegedly unconstitutional jury venire selection process. The appellant apparently contends that the list from which the venire was selected was inadequate because it did not include "all citizens" of the state of Alabama. The appellant contends that, in addition to including the names of licensed drivers, the venire list should have included individuals on "voter registration lists, social security rolls, property landowners, and other census rolls."
In the present case, the record indicates that the method of selecting prospective jurors was by random selection of names from driver's license lists. This Court has repeatedly held that this method of juror selection does not violate the right to a fair cross-section of the population. See Dobyne v.State, 672 So.2d 1319 (Ala.Cr.App.), aff'd, 672 So.2d 1354
(Ala. 1995); Inabinett v. State, 668 So.2d 170
(Ala.Cr.App. 1995); Hogan v. State, 663 So.2d 1017
(Ala.Cr.App. 1994). "A failure to include the name of every qualified person on the jury roll is not a ground to quash an indictment or a venire, absent fraud or purposeful discrimination." Joyce v. State, 605 So.2d 1243, 1245
(Ala.Cr.App. 1992). The appellant has failed to prove either fraud or purposeful discrimination. The trial court did not err in denying the appellant's motion to quash the venire.
The appellant also contends that the trial court erred in denying his motion to quash the jury venire because, he says, those veniremembers holding Judeo-Christian values were systematically excluded. Specifically, the appellant argues that the prospective jurors, on questionnaires, stated their beliefs regarding the death penalty and that based upon their answers all the prospective jurors who indicated that they were strongly opposed to capital punishment were eliminated from the jury panel for cause. The appellant also alleges that a large number of the prospective jurors who answered that they were strongly in favor of the death penalty remained on the venire.
The appellant cites Witherspoon v. Illinois,391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) in his brief to this court; however, his argument fails to refer to Wainwright v.Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).
 "Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), set the early standard for a court's exclusion for cause of venirepersons who oppose the death penalty. The Court in dicta in Witherspoon limited exclusion for cause to those venirepersons who made it `unmistakably clear (1) that they would automatically vote against imposition of capital punishment . . . or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.' Id. 522-23 n. 21, 88 S.Ct. at 1777 n. 21. Subsequently, in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841
(1985), the Court clarified or modified its decision in Witherspoon by holding that the state may exclude venirepersons in capital cases whose views would `"prevent or substantially impair the performance of [their] duties as a juror in accordance with his instruction and [their] duties as a juror in accordance with his instruction and [their] oath."' Id., 469 U.S. at 424, 105 S.Ct. at 852
(quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The new Witt standard dispensed with the Witherspoon reference to `automatic' decisionmaking, and eliminated the requirement that a venireperson's bias be proved with `unmistakable clarity.' 469 U.S. at 424, 105 S.Ct. at 852."
Smith v. State, 698 So.2d 189 n. 5 (Ala.Cr.App. 1996).
The appellant does not seek a review of the trial court's dismissal of potential jurors under the Witherspoon andWainwright standard. Rather, the appellant argues that *Page 973 
those veniremembers who shared Judo-Christian beliefs were systematically excluded and that this systematic exclusion denied him equal protection and due process of the law. To support his argument, the appellant cites §§ 12-16-55 and12-16-56, Code of Alabama 1975, which state:
"§ 12-16-55, Declaration of Policy:
 "It is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens have the opportunity, in accordance with this article, to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose."
 "§ 12-16-56, Discrimination prohibited.
 "A citizen shall not be excluded from jury service in this state on account of race, color, religion, sex, national origin or economic status."
The State argues that the prospective jurors who were removed from the jury venire were removed for cause based on their views as to the death penalty after questioning by the trial court and both parties during individual voir dire examination, and not based on a response on a questionnaire. Furthermore, the questionnaires were not made part of the record.
The appellant contends that a systematic exclusion of people sharing certain religious beliefs denied his constitutional right to have a jury venire comprised of a fair cross-section of the community.
 "`In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.'"
Rayburn v. State, 495 So.2d 733, 734-735, (Ala.Cr.App. 1986), quoting Duren v. Missouri,439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).
A complete review of the voir dire examination clearly reveals that each challenge for cause was justified. There were prospective jurors that expressed strong reservations both for and against the death penalty. All of those excused were removed based on their expressed inability to follow the law, not based on their religious beliefs. The appellant's argument that the venire should have been quashed because it was not comprised of a fair cross-section of the community is not supported by the record.
 "A trial court's ruling on challenges for cause based on alleged bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion. Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala. 1981). . . . If the veniremember indicates that he or she can lay aside that impression or opinion and render a verdict based on the evidence presented in court, the juror is not subject to challenge for cause. Minshew v. State; Mahan v. State, 508 So.2d 1180 (Ala.Cr.App. 1986)."
Smith, 698 So.2d at 200.
In Johnson v. State, 502 So.2d 877 (Ala.Cr.App. 1987), this court faced a similar fact situation. The appellant inJohnson argued that excluding veniremembers who expressed opposition to the death penalty denied him the right to a jury comprised of a fair cross-section of the community. The Johnson court relied on Lockhart v.McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), in which the United States Supreme Court stated:
 "`The essence of a "fair cross-section" claim is the systematic exclusion of "a `distinctive' group in the community." Duren [v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979)]. In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing *Page 974 
one of their duties as jurors, such as the "Witherspoon-excludables" at issue here, are not "distinctive groups" for fair cross-section purposes.'
 "Lockhart v. McCree, 476 U.S. at 174, 106 S.Ct. at 1765."
Johnson, 502 So.2d at 879.
Those jurors who were discharged because they indicated strong feelings against imposing the death penalty had stated during the lengthy voir dire examination that their attitudes would prevent or substantially impair their ability to follow the law and to perform their duties as jurors. The appellant's argument assumes that all persons who share Judeo-Christian values are opposed to capital punishment. Although those who were discharged shared the same attitude toward capital punishment, there is no evidence to show that they shared the same religious beliefs. The trial court did not err in denying the appellant's motion to quash the entire jury venire.
 VI
The appellant further contends that the trial court erred in denying his Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion. The Batson Court held that black veniremembers could not be struck from a black defendant's jury because of their race. 476 U.S. at 89, 106 S.Ct. at 1719. In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364,113 L.Ed.2d 411 (1991), the Court extended its decision inBatson to white defendants. Batson was further extended to civil litigants in Edmonson v. LeesvilleConcrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660
(1991). The United States Supreme Court in Georgia v.McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33
(1992), held that Batson was also applicable to the defense counsel in criminal trials.
Specifically, the appellant contends that the court erred in holding that he failed to establish a prima facie case of racial discrimination.
 "A defendant claiming a Batson violation must make a prima facie showing that the prosecution used its peremptory strikes in a discriminatory manner. Jackson v. State, 594 So.2d 1289 (Ala.Cr.App. 1991). Only when the defendant establishes facts and circumstances that raise an inference of discrimination must the state give its reasons for its peremptory strikes. Carter v. State, 603 So.2d 1137 (Ala.Cr.App. 1992)."
Stokes v. State, 648 So.2d 1179, 1180
(Ala.Cr.App. 1994). We will reverse a trial court's ruling on aBatson motion only when that ruling is clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala. 1987).
Here, there was absolutely no indication that the prosecutor used his strikes in a racially motivated manner. The only evidence presented were the fact that the state used one peremptory strike to remove one black from the venire and that no blacks sat on the jury.
 "In Ashley v. State, 606 So.2d 187
(Ala.Cr.App. 1992), the prosecution used three of its seven strikes to remove blacks from the pool of potential jurors. This court held that the `appellant failed to establish a prima facie case under Batson and Ex parte Branch
[526 So.2d 609 (Ala. 1987)] because the appellant failed to show any evidence of discrimination other than the number of blacks struck.' Ashley, 606 So.2d at 192. Similarly in the present case, the only evidence presented to the trial court by the appellant was the fact that three out of the seven potential black jurors were struck by the prosecution. There was no evidence presented that any of the factors set out in Ex parte Branch, 526 So.2d 609 (Ala. 1987), which may be used to establish a prima facie case, existed. The evidence presented at trial was not sufficient to prove a prima facie case of a Batson violation. The trial court did not err in denying the appellant's Batson motion."
Moore v. State, 677 So.2d 828, 829 (Ala.Cr.App. 1996).
 "When determining whether a challenging party has shown a prima facie case of racial discrimination in the use of peremptory strikes, `the court is to consider "all relevant circumstances" which could lead to an inference of [such] discrimination.' Ex parte Branch, 526 So.2d 609, 622 (Ala. *Page 975 
1987). The challenging party `may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.' Batson, 476 U.S. at 96, 106 S.Ct. at 1723
(emphasis added). Normally, the challenging party has not shown that the prosecution used its peremptory strikes in a racially discriminatory manner where the only evidence presented in support of a prima facie case of discrimination is the fact that blacks were struck by the prosecution. Ex parte Branch, 526 So.2d 609, 622-23 (Ala. 1987), contains a nonexclusive list of factors that a challenging party might use to establish a prima facie case of discrimination. This list includes, `[a] pattern of strikes against [jurors of a certain gender or race] on a particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors.' Branch, 526 So.2d at 623 (emphasis added). A pattern `"implies that the decisionmaker . . . selected . . . a particular course of action at least in part `because of,' not merely `in spite of,' its adverse effects upon an identifiable group,' Hernandez [v. New York], 500 U.S. 352, 360, 111 S.Ct. [1859] at 1866, 114 L.Ed.2d 395 [(1991)] (quoting Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)) (footnote and citation omitted in Hernandez).' Freeman v. State, 651 So.2d 576, 583 (Ala.Cr.App. 1994). When determining whether peremptory strikes were used in a manner to suggest a discriminatory `pattern of strikes,' `[m]erely showing that the challenged party struck one or more members of a particular race is not sufficient to establish a prima facie case [of discrimination].' Edwards v. State, 628 So.2d 1021, 1024 (Ala.Cr.App. 1993)."
Bell v. State, 676 So.2d 1349, 1350 (Ala.Cr.App. 1995) (Emphasis in original.)
 Here, the trial court did not err in finding that the appellant failed to establish a prima facie case of discrimination. The voir dire examination of the prospective jurors in this case was extensive, covering approximately four volumes of record. There is absolutely no indication that any Batson
violation occurred here.
 VII
The appellant next contends that the trial court erred by removing him from the courtroom and subsequently denying his motion for a mistrial because of alleged prejudice resulting from his outbursts in court. The appellant further contends that he was denied his Sixth Amendment right of confrontation because he was removed from the courtroom during his trial.
The record reflects that, during the State's case-in-chief, the appellant became disruptive, disorderly, and uncooperative. Specifically, the appellant, in the presence of the jury, arose from his seat and yelled that he had already been convicted of the crime in federal court and that he wanted to dismiss his lawyers because they were incompetent. Throughout the appellant's disruptive tirade, the trial judge repeatedly told the appellant that he should remain seated and act in an orderly fashion. On several occasions, the trial judge warned the appellant that if he did not cease his offensive behavior he could choose between being bound and gagged for the remainder of the trial or totally removed from the courtroom. The appellant ignored the judge's repeated instructions and continued to act disruptively. The appellant insisted on being removed from the courtroom and taken back to the jail.
After he was removed from the courtroom, the appellant was asked on numerous occasions to return to the courtroom. The appellant repeatedly refused the requests. In fact, on one such occasion, the appellant was asked to return to the courtroom, and he responded: "[T]ell that Judge that I said that I have fired those attorneys and they can kiss my ass and I am not coming back up [to the courtroom]." The appellant was given the opportunity to view the proceedings on a television monitor located outside the courtroom; he refused.
The appellant now contends that because of these actions, the trial court should have granted his motion for a mistrial. InIllinois v. Allen, 397 U.S. 337, 343, 90 S.Ct. 1057, *Page 976 
1060-61, 25 L.Ed.2d 353, 358-59 (1970), the United States Supreme Court stated:
 "Although mindful that courts must indulge every reasonable presumption against the loss of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019 [1023], 82 L.Ed. 1461
(1938), we explicitly hold today that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.
 "It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like [the appellant]: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; [or] (3) take him out of the courtroom until he promises to conduct himself properly."
Alabama, in keeping with the standards articulated inIllinois, adopted Rule 9.2, Ala. R.Crim.P., which states:
 "If a defendant engages in disruptive or disorderly conduct so that the trial . . . cannot be carried on in an orderly manner, the court, after having warned the defendant of the consequences of such conduct, may, if such conduct continues, order the defendant to be bound and gagged, or otherwise restrained or removed from the trial or proceeding. If the defendant continues such disruptive or disorderly conduct after warning, he shall be deemed to have forfeited the right to be present at that trial or proceeding."
Rule 9.2(b) provides that an accused who has been previously removed from the courtroom or restrained has the right to return to the courtroom if the accused can assure the court that he or she will not again disrupt the proceedings. Rule 9.2(c) directs the trial court to provide the accused removed from the trial with the ability to hear, observe, and be informed of, the remaining portions of the trial or proceeding.
The Alabama Supreme Court, in keeping with the above principles of law, has recognized that a defendant in a capital murder case may "forfeit [the] right to be present at trial by exhibiting misconduct." Ex parte Jackson,674 So.2d 1365, 1369 (Ala. 1994). (Emphasis added.) As was previously stated in Hayes v. State, 340 So.2d 1142, 1143
(Ala.Cr.App. 1976), cert. denied, 340 So.2d 1144 (Ala. 1977):
 "As to the appellant's contention that a mistrial should have been declared, we hold that one cannot purposefully create grounds for a mistrial by deliberately causing a disturbance during the trial. See Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Such a conclusion is obviously necessary, otherwise a defendant faced with imminent conviction could disrupt the trial, prejudice himself in the jury's eyes and, therefore, be entitled to another trial.
 "We will not condone such and thus will not allow a defendant to benefit from his own misconduct in the courtroom. The trial judge here acted in a judicious and completely proper manner, and we find no error on his part in denying the motion for a mistrial."
The record also reflects that before the appellant's disruptive behavior the appellant noticed that everyone who indicated that they had heard that the appellant had been tried in federal court for this murder was excused from the venire during voir dire examination. Clearly, if error occurred here *Page 977 
it was invited by the appellant's conduct; he cannot profit from such behavior. Hayes.
 VIII
The appellant next contends that the trial court erred in denying his motion for a change of venue because, he says, the extensive pre-trial publicity made it impossible for him to get a fair trial. Specifically, the appellant contends that of the 14 jurors and alternates, 4 had indicated that they had heard or read about the case and therefore, he argues, he could not receive an impartial trial in that county.
 "A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court's ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130
(Ala.Cr.App. 1983)."
Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App. 1994).
The Alabama Supreme Court in Ex parte Grayson,479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189,88 L.Ed.2d 157 (1985), set forth the standard to determine whether a motion for a change of venue based upon pretrial publicity should be granted. The court stated:
 "In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala.Cr.App. 1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Cr.App. 1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
 "`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. . . .'
 "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, `[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Cr.App. 1978)."
Grayson, 479 So.2d at 80.
Here, the trial court conducted an extensive voir dire examination of all prospective jurors who responded that they had heard something about the case. All of those prospective jurors responded that they could disregard anything they had previously seen or heard and base their verdict strictly on the facts and the law as instructed by the court.
 "[A] change of venue must be granted only when it can be shown that the pretrial publicity has so `pervasively saturated' the community as to make the `court proceedings nothing more than a "hollow formality"' . . . or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant."
Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App. 1993).
 "As no juror was actually prejudiced, relief may be granted only upon satisfaction of the presumed prejudice standard . . . This standard is reserved for extreme situations where pretrial publicity renders virtually impossible a fair trial by an impartial jury drawn from the community."
United States v. De La Vega, 913 F.2d 861, 865 (11th Cir. 1990), cert. denied, Carballo v. *Page 978 United States, 500 U.S. 916, 111 S.Ct. 2011,114 L.Ed.2d 99 (1991).
The appellant presented absolutely no evidence that the pretrial publicity had so saturated the community or that the pretrial publicity biased the members of the venire. "The defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case or to jurors who never entertained a preconceived notion as to the defendant's guilt or innocence." Grayson, 479 So.2d at 80.
The prospective jurors were questioned extensively regarding their knowledge of the case and any effect that pretrial publicity may have had on their ability to be fair and impartial. No responses made by the prospective jurors indicated that any actual prejudice existed here. The trial court did not err in denying appellant's motion for a change of venue.
 IX
The appellant next contends that the trial court erred in denying his motion to suppress statements he made to police. More specifically, the appellant contends that statements he made to F.B.I. agents in Cleveland, Ohio, were not voluntary because, he says, he was told that the agents "would make [his] cooperation known to the United States Attorney's Office."
All extrajudicial statements are deemed involuntary, and it is incumbent upon the state to prove that the statement was voluntary and that the accused was advised of his Miranda v.Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966), rights. Morrison v. State, 601 So.2d 165
(Ala.Cr.App. 1992); Whitlow v. State, 509 So.2d 252
(Ala.Cr.App. 1987); Malone v. State, 452 So.2d 1386
(Ala.Cr.App. 1984). "The true test of determining whether extrajudicial confessions are voluntary is whether the defendant's will was overborne at the time he confessed and therefore not the product of rational intellect and free will. . . .Elliott v. State, 338 So.2d 483 (Ala.Cr.App. 1976)." Gaddy v. State, 698 So.2d 1100, 1114
(Ala.Cr.App. 1995).
During the hearing on the motion to suppress, Special Agent Phillip Torsney testified that he advised the appellant of hisMiranda rights and that the appellant indicated that he understood those rights. Agent James Larkin, also present during the interview, testified that the appellant was not coerced or threatened into making a statement. Agent Larkin also stated that he gave the appellant a copy of an affidavit faxed to the F.B.I. in Cleveland from Birmingham that detailed the charges against the appellant. Agent Larkin further stated that before the appellant made any statement Larkin told him that he would tell the United States Attorney's Office that the appellant had cooperated but that he could not promise the appellant anything.
In determining whether a statement was the product of coercion, the Gaddy, supra, court explained that while conducting this inquiry we should look not only at the totality-of-the-circumstances surrounding the confession, but also the "characteristics of the individual defendant."
The appellant had previously been convicted of carjacking and had been sentenced to three years as a youthful offender. The appellant was familiar with the workings of the criminal justice system.
 "`The defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining his susceptibility to police pressures. Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224
(1948); Martin v. Wainwright, 770 F.2d 918
(11th Cir. 1985)'"
Gaddy, 698 So.2d at 1114, quoting Jackson v.State, 562 So.2d 1373, 1380-81 (Ala.Cr.App. 1990).
Further,
 "`"[A] representation that the fact of cooperation will be made known to prosecuting authorities is insufficient to make a confession involuntary. United States v. Curtis, 562 F.2d 1153 (9th Cir.), cert. denied, 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978)." United States v. *Page 979 Prescott, 480 F.Supp. 554, 559 (W.D.Penn. 1979) (The defendant alleged that his oral statements were involuntary because his cooperation was induced by a promise that if he cooperated the F.B.I. Agents would tell the United States Attorney and it would go easier on him.) "[T]elling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government." United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978) (Defendant told that in return for her cooperation the government would make a recommendation and inform the court of her cooperation); United States v. Morris, 491 F.Supp. 226 (S.D.Ga. 1980) (F.B.I. agents told defendant: "If you cooperate, it will go easy on you," and further told him the possible penalties for armed robbery.) See also United States v. Hart, 619 F.2d 325 (4th Cir. 1980); United States v. Jacks, 634 F.2d 390 (8th Cir. 1980); Wallace v. State, 290 Ala. 201, 275 So.2d 634 (1973); Moss v. State, 347 So.2d 569 (Ala.Cr.App. 1977); Tanner v. State, 57 Ala.App. 254, 327 So.2d 749 (1976).
Gaddy, 698 So.2d at 1113, quoting Bennett v.State, 409 So.2d 936, 940 (Ala.Cr.App. 1981), cert. denied,457 U.S. 1137, 102 S.Ct. 2968, 73 L.Ed.2d 1356 (1982).
The standard for reviewing a trial judge's ruling on the voluntariness of a confession is stated in Morrison, supra:
 "The trial judge need only be convinced of the voluntariness of the statement by a preponderance of the evidence, see Colorado v. Connelly, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473
(1986), and his finding of voluntariness will be reversed on appeal only if `manifestly contrary to the weight of the evidence.' Malone v. State, 452 So.2d 1386, 1389 (Ala.Cr.App. 1984)."
601 So.2d at 174.
The appellant was advised of his Miranda rights and told the interrogating officer that he understood them. At no time did the appellant request an attorney or state that he felt intimidated. There was no evidence that the statement was coerced. A review of the totality-of-the-circumstances leads us to conclude that the trial court's finding that the confession was voluntary is not contrary to the great weight of the evidence or manifestly wrong.
 X
The appellant next contends that the trial court erred by allowing into evidence testimony of collateral crimes. The appellant made a motion in limine, seeking to exclude evidence of the appellant's prior convictions for carjacking.
As a general rule, evidence of a collateral offense is not admissible at the trial of an unrelated offense. However, there are certain exceptions to this general exclusionary rule, which the appellate courts of this state have long recognized. These exceptions and the standard used to determine whether evidence of collateral crimes should be received at trial were discussed by this court in Bush v. State, 695 So.2d 70
(Ala.Cr.App. 1995). In Bush, this court stated:
 "Evidence of any offense other than that specifically charged is prima facie inadmissible. Nicks v. State, 521 So.2d 1018 (Ala.Cr.App. 1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). However, evidence of collateral crimes or bad acts is admissible as part of the prosecutor's case if the defendant's collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty of the charged offense because of his past misdeeds. Nicks v. State; Brewer v. State, 440 So.2d 1155 (Ala.Cr.App. 1983); C. Gamble, McElroy's Alabama Evidence, § 69.01(1) (4th ed. 1991). Before its probative value will be held to outweigh its potential prejudicial effect, the evidence of a collateral crime must not only be relevant, it must also be reasonably necessary to the state's case, and it must be plain and conclusive. Averette v. State, 469 So.2d 1371
(Ala.Cr.App. 1985). If evidence of the accused's commission of another crime is admissible, the state may prove in meticulous detail the manner in which the accused committed such other crime. Nelson v. State, 511 So.2d 225, 234 (Ala.Cr.App. 1986), *Page 980 
aff'd, 511 So.2d 248 (Ala. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); Weatherford v. State, 369 So.2d 863
(Ala.Cr.App.), cert. denied, 369 So.2d 873 (Ala.), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91 (1979); McElroy's, § 69.02(8). The generally recognized exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted are as follows:
 "`(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.'
 "Nelson v. State, 511 So.2d 225, 233
(Ala. Cr.App. 1986); Twilley v. State, 472 So.2d 1130
(Ala.Cr.App. 1985). All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557
(1953); Nicks v. State. If the evidence is not so remote as to lose its relevancy, the decision to allow or to not allow evidence of collateral crimes or acts as part of the state's case rests in the sound discretion of the trial court. McGhee v. State, 333 So.2d 865 (Ala.Cr.App. 1976)."
695 So.2d at 85. See also Finley v. State,661 So.2d 762 (Ala.Cr.App. 1995); Malone v. State, 659 So.2d 1006
(Ala.Cr.App. 1995); Miles v. State, 650 So.2d 583
(Ala.Cr.App. 1994).
In receiving evidence of the prior convictions for carjacking, the trial court stated that these prior crimes met an exception to the general exclusionary rule because the evidence showed a common plan or scheme and could also be used for identification purposes. When the trial court made its ruling on the admissibility of the evidence of the prior offenses, the appellant had stated that he intended to pursue an alibi defense. However, at trial the appellant did not take the stand and he had no witnesses testify on his behalf. The appellant's identity was not placed in issue by an alibi defense, but it was placed into issue when on cross-examination he attacked the state's witnesses' identification of him as the person who murdered Althouse. The collateral offenses were properly introduced under both the identity exception and the common plan and scheme exception.
This court in Howell v. State, 627 So.2d 1134, 1140
(Ala.Cr.App. 1993), stated:
 "Almost invariably, the identity and common plan, design, or scheme exceptions are discussed together in cases. In fact, the Alabama Supreme Court has stated that the common plan, design, or scheme exception to the general exclusionary rule is `essentially co-extensive with the identity exception.' Ex parte Darby, 516 So.2d 786, 789 (Ala. 1987). See also 2 Wigmore on Evidence (Chadbourn rev. 1979), § 304.
 "`"Evidence of the accused's commission of another crime is admissible if such evidence, considered with other evidence in the case, warrants a finding that both the now-charged crime and such other crime were committed in keeping with or pursuant to a single plan, design, scheme, or system, whether narrow or broad in scope." Nicks v. State, 521 So.2d 1018, 1027 (Ala.Cr.App. 1987), affirmed, 521 So.2d 1035 (Ala. 1988), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), citing C. Gamble, McElroy's Alabama Evidence, § 69.01(6) (3rd ed. 1977).'
 "Harvey v. State, 579 So.2d 22, 26
(Ala.Cr. App. 1990)."
In the instant case, there are overwhelming similarities in the charged crime and the collateral offenses. The record clearly indicates that in each of the prior uncharged offenses, the appellant was driving around accompanied by one or two companions looking for high-performance sports cars to steal. In each case, a gun was used to steal the automobile from its occupant, and in each *Page 981 
case the stolen vehicle was deposited in the same neighborhood. The appellant exhibited a distinctive method in each carjacking. The last carjacking offense was distinguished from the previous crimes only because it resulted in the murder of Agent Althouse.
The evidence of the other offenses was properly admitted as part of a common plan, design, scheme, or system including the offense at issue, and further went toward proving the appellant's identity. The evidence of prior carjackings was properly received into evidence, and it is clear that the probative value of its admissibility outweighed any prejudicial effect that may have resulted.
 "If the evidence of a collateral crime clearly falls within one of the exceptions to the general exclusionary rule, it should be admitted as having probative value on the issue of guilt other than as tending merely to show the accused's bad character. If there is a close question of whether the crime falls into one of these exceptions, admissibility is within the discretion of the trial court. Whitley v. State, 37 Ala.App. 107, 64 So.2d 135 (1953).
Nicks v. State, 521 So.2d 1018, 1028
(Ala.Cr. App. 1987) aff'd, 521 So.2d 1035 (Ala.), cert. denied,487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988).
For the foregoing reasons, evidence of the collateral offenses was correctly received during trial.
 XI
The appellant further contends that the trial court erred in not granting a mistrial, ex mero motu, after the sequestered jurors were disrupted. The following occurred during trial:
 "The Court: [T]his morning at 3:30, or approximately 3:30 a.m. — well, actually, I've got a note right here. We can just go ahead and put this on the record. This is written by [M.R.]. Let's go ahead and have this marked as a court's Exhibit.
 "(Whereupon, court's exhibit 2 was marked for identification.)
 "The Court: The gist of this note, as I have shown counsel, happens to be that someone knows that the jury is over at the Days Inn [motel] and they are also trying to influence this trial possibly to the extent of trying to get the Court to order a mistrial by going — I think — I guess it was down the hallway. But at any rate, outside the rooms of the jurors and clapping his hand and saying `guilty, guilty, guilty'. And what we are doing at this time, we are going to try to either, number one, put them in a different place or, number two, have the sheriff's department to safeguard it to make sure we don't have this problem to crop up at any further times during the course of this trial.
 "However, we are going to have to address this particular issue and I think we are going to have to talk to [M.R.] in private. I think we may have to as well talk to the other jurors to see if they heard anything last night. I need to kind of get an idea and see what y'all want to do in this respect. I think we are going to have to talk to [M.R.] and see if it's influenced her in any way.
 "Mr. Owens [Prosecutor]: If we have to talk to all the jurors, I prefer we do it as a group with a very simple question, something as simple as — to the effect `Have any of you all been disturbed during the night regarding any issues?'
 "Ms. Johnson [Defense Counsel]: `Has there been any occurrence during the night that has any bearing on this case or is related to this matter that we're here for?'
 "The Court: All right. Now, if I do that and we get a show of hands, several hands, how do you want to proceed on it? Do y'all want to take those individually?
 "Mr. Owens: Take them individually.
 "Mr. Johnson: Then we've got a real dilemma. I don't know —
 "Mr. Owens: We'll have to ask each one of them if they have been influenced in any manner.
 "Mr. Johnson: Yeah. I suppose so. My understanding is nobody can identify this disrupter.
 ". . . . *Page 982 
 "(Whereupon, [M.R.] was brought into the courtroom.)
 "The Court: Let me just ask you something with the attorneys present. I got a note from you this morning about something that — that you heard last night.
 "Juror [M.R.]: Yes, sir.
 "The Court: You want to add anything to that note?
 "Juror [M.R.]: As —
 "The Court: Well, I mean, it described the occurrence of somebody —
 "Juror [M.R.]: That was basically it. You know, I did not go outside and look to see who or, you know, anything of that nature. But it was — it was loud enough that it was meant to be heard because I had my air conditioner on so that the fan would run constantly to keep the background noise of the trucks that, you know, are coming and going during the night.
 ". . . .
 "The Court: Let me ask you this: Because you heard this, is that going to affect you in any way whatsoever in this trial?
 "Juror [M.R.]: No. Because we have yet to hear everything we need to hear. But you did want to be aware of anything we did hear.
 "The Court: Can you disregard that statement and again just listen to the facts in this case and the law that I give you in this case and render a verdict based upon that and just totally disregard those statements that were made?
 "Juror [M.R.]: Yes, I can.
 "Mr. Owens: Ma'am, you don't in any way draw any conclusion that either party in this courtroom would partake in such an event as that?
 "Juror [M.R.]: No. My assumption — do you want my assumption or the way I felt?
 "The Court: That would be fine.
 "Juror [M.R.]: I just assumed that probably — I know that people that are staying there know that we are there, you know, just, because talk is talk in conversation. But I just assumed when I heard it and sat up in bed it was more than likely truckers that were coming through getting ready to leave in the middle of the night. And it's a joke to them, just get out there and make something —"
As was stated in Riddle v. State, 661 So.2d 274, 276
(Ala.Cr.App. 1994):
 "We agree with the trial judge that a mistrial was not justified because the `damage was controlled' and the jury that actually tried the appellant was not influenced. . . .
 "`A motion for mistrial "is addressed to the sound discretion of the trial court, and its ruling will not be reversed in the absence of a clear showing of abuse of discretion." Ex parte Jefferson, 473 So.2d 1110, 1114 (Ala. 1985), cert. denied, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 300 (1986). In cases involving juror misconduct, a trial court generally will not be held to have abused its discretion "where the trial court investigates the circumstances under which the remark was made, its substance, and determines that the rights of the appellant were not prejudiced by the remark." Bascom v. State, 344 So.2d 218, 222
(Ala.Cr.App. 1977). However, the trial judge has a duty to conduct a "reasonable investigation of irregularities claimed to have been committed" before he concludes that the rights of the accused have not been compromised. Phillips v. State, 462 So.2d 981, 990 (Ala.Cr.App. 1984). His investigation should include a "painstaking and careful" inquiry into the alleged juror misconduct. Lauderdale v. State, 22 Ala.App. 52, 54, 112 So. 92, 93 (1927).
 "`. . . .
 "`. . . [W]hen the trial judge acts promptly to investigate the circumstances surrounding the making of an inherently prejudicial remark by a veniremember, determining specifically whether the remark was made and whether the remark had a prejudicial effect on those who, ultimately selected to serve as jurors, heard it, there is no error in the denial of a motion for mistrial based on jury contamination.
 "`. . . . *Page 983 
 "`"The standard for determining whether juror misconduct requires a new trial is set forth in Roan v. State, 225 Ala. 428, 435, 143 So. 454, 460 (1932) [citing Lauderdale with approval]."
 "`"`The test of vitiating influence is not that it did influence a member of the jury to act without the evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced its verdict rendered.'"
 "`Ex parte Lasley, 505 So.2d 1263, 1264
(Ala. 1987).'
 "Holland v. State, 588 So.2d 543, 546, 548-49 (Ala.Cr.App. 1991) (material in brackets added in Holland) (emphasis added in Lasley omitted)."
As this court stated in Anderson v. State,389 So.2d 180, 182 (Ala.Cr.App. 1980): "While the conversation was an unauthorized communication, there is no valid claim that it might have unlawfully influenced the juror or other members of the jury. Bascom v. State, 344 So.2d 218, 222
(Ala.Cr.App. 1977)."
The record reflects that the trial court conducted a very lengthy discussion with the juror who had been awakened by someone shouting "guilty" outside her motel room. The juror unequivocally stated that what she had heard would not affect her ability to render a fair and impartial verdict. The juror also said that the next morning she asked the juror who was in the room next to hers if she had heard anything the night before. This juror had not heard what [M.R.] had heard. It is clear that the trial court thoroughly investigated the incident and found no grounds for a mistrial. The appellant makes no argument on appeal that the jury was improperly influenced; indeed there is no evidence that it was. The trial court did not err in not ordering a mistrial.
 XII
The appellant further contends that the trial court erred in denying his motion for a judgment of acquittal because, he says, there was not "sufficient credible evidence" to establish his guilt.
 "The `weight of the evidence' refers to `"a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other."' Tibbs v. Florida, 457 U.S. 31, 37-38, 102 S.Ct. 2211, 2216, 72 L.Ed.2d 652 (1982). Bland v. State, 601 So.2d 521, 524 (Ala.Cr.App. 1992); Johnson v. State, 555 So.2d 818, 820 (Ala.Cr.App. 1989). Conflicting evidence presents a jury issue. Smith v. State, 583 So.2d 990 (Ala.Cr. App.), writ denied, 583 So.2d 993 (Ala. 1991). `The jury is the judge of the facts, the demeanor of the witnesses, and their testimony.' Finch v. State, 445 So.2d 964 (Ala.Cr.App. 1983). . . . Where facts are presented from which the jury could reasonably infer that the alleged crime has been committed, then the question must be submitted to the jury. Brandon v. State, 542 So.2d 1316 (Ala.Cr.App. 1989). `The jury is then under a duty to draw permissible inferences from the circumstantial evidence presented and to base its verdict accordingly.' Id.
at 1318."
Saffold v. State, 627 So.2d 1107, 1109
(Ala.Cr. App. 1993).
There was certainly sufficient evidence, as detailed above, to present the case to the jury for its determination. Any questions concerning the credibility or the weight of the evidence were for the jury to resolve. The questions were resolved against the appellant. This court's function is not to evaluate the credibility of the evidence.
 XIII
The appellant next contends that he was denied his constitutional right to the effective assistance of counsel. Specifically, he contends that he was denied effective assistance because, he says, his trial counsel did not present alibi evidence that he maintains included the testimony of five witnesses.
The record reflects that after the appellant was removed from the courtroom for his disruptive behavior, defense counsel stated the following for the record:
 "Mr. Johnson: [W]e do not anticipate calling any witnesses on the defendant's behalf and I understand that that will be *Page 984 
subject to a lot of accusations. However, I feel that I have done everything I can in an attempt to locate a witness that would be helpful both on the alibi defense and in regard to any other argument that we might could make in this case. And no such witness exists."
Later in the record defense counsel stated the following:
 "Mr. Johnson: I went on the — I went on the record yesterday as stating that the defendant had created a situation which I felt like, and this is a judgement strictly of mine and no one else's, that I felt like made it difficult, if not impossible, to continue to pursue the defense as had been discussed with my client. At that point, I made a conscious decision that — to abandon what I believe to have been a defense that would not be available to this jury and, in fact, a defense which has already been tried in another forum and found to be incredible by another jury."
To prevail on a claim of ineffective assistance a party must show 1) that counsel's performance was deficient and 2) that he was prejudiced by the deficient. Strickland v.Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
(1984).
Rarely is there a case as strong as the one here, where absolute proof exists that the appellant was not prejudiced by trial counsel's actions. Here, a federal jury had heard the appellant's witnesses who testified as to alibi and had disregarded their testimony and found the appellant guilty. Clearly, the appellant has failed to satisfy theStrickland test.
 XIV
The appellant further contends that the trial court erred in recharging the jury on certain portions of its charge in the appellant's absence. We observe that no objection was made to this during trial; thus this court must review this issue under the plain error doctrine. Initially, we observe that the appellant was absent from the proceedings because of his disruptive behavior, as discussed above. No violation of the appellant's right to be present occurred here for the reasons discussed earlier.
Furthermore, the record reflects that during deliberations the jury returned with a note requesting that the trial court recharge them on the elements of capital murder, intentional murder, and felony murder. The trial court recharged the jury on the three charges that the jury requested.
 "`When a jury requests additional instructions the recommended practice is for the trial court to remain within the area of the specific request in making his response. East v. State, 339 So.2d 1104, 1106-07 (Ala.Cr.App. 1976). A trial judge is not required to repeat any other part of his oral charge when answering a specific inquiry from the jury. White v. State, 195 Ala. 681, 686, 71 So. 452
(1916); Thomas v. State, 393 So.2d 504, 508
(Ala.Cr.App. 1981). It is assumed that the jury will consider the previously given instructions along with those given in the supplemental charge. Turner v. State, 160 Ala. 40, 47, 49 So. 828 (1909).'
 "Davis v. State, 440 So.2d 1191, 1195
(Ala. Cr.App. 1983), cert. denied, 465 U.S. 1083, 104 S.Ct. 1452, 79 L.Ed.2d 770 (1984). See also Deutcsh v. State, 610 So.2d 1212, 1217-18 (Ala.Cr.App. 1992)."
Miller v. State, 645 So.2d 363, 365
(Ala.Cr. App. 1994). "[A] trial judge is not required to repeat any other part of his oral charge when answering a specific inquiry from the jury, and it is assumed that the jury will consider the previously given instructions along with those given in the supplemental charge." Fountain v. State, 586 So.2d 277,281 (Ala.Cr.App. 1991). No error occurred here.
The appellant further contends that the trial court erred in its instructions on aggravating and mitigating circumstances made during the penalty phase of the proceedings.
The record reflects that, after the trial court's instructions in the penalty phase, one of the jurors asked the court to redefine the difference between aggravating circumstances and mitigating circumstances. The appellant contends that when the trial court reinstructed the jury it told the jurors that one mitigating circumstance was present. *Page 985 
However, this allegation is not supported by the record. The trial court told the jury that one mitigating circumstance was present, that being the appellant's age at the time of the offense. The trial court also told the jurors that they were free to consider anything else in mitigation. No error occurred here.
 XV
As required by § 13A-5-53, Code of Alabama 1975, this court must review the propriety of the appellant's conviction and sentence to death by electrocution. The appellant was convicted of capital murder as defined in § 13A-5-40(a)(2), because the murder occurred the course of a robbery.
A review of the record reflects that the appellant's sentence to death was not the result of any influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1).
The trial court found as an aggravating circumstance that the murder was committed during the course of a robbery. § 13A-5-49(4). The trial court found as mitigation that the appellant did not have a significant history of criminal activity and that he was 20 years old at the time of the murder. § 13A-5-51(1) and 13A-5-51(7). The trial court found no nonstatutory mitigating circumstances. The trial court weighed the aggravating and the mitigating circumstances and found that the aggravating circumstances outweighed the mitigating circumstances.
According to § 13A-5-53(b)(2), this court must independently weigh the aggravating and the mitigating circumstances. We have weighed all of the evidence presented in support of aggravating and mitigating circumstances and are convinced that the appellant's sentence to death is appropriate and that the aggravating circumstances outweigh the mitigating circumstances.
As required by § 13A-5-53(b)(3), this court must also determine whether the appellant's sentence is disproportionate to the penalties imposed in similar cases. The appellant's sentence is neither disproportionate or excessive. Approximately two-thirds of the death penalty cases in Alabama involve murders committed during the course of a robbery.Williams, supra; Brownlee v. State,545 So.2d 151 (Ala.Cr.App. 1988), aff'd, 545 So.2d 166 (Ala.), cert. denied,493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).
Last, as required by Rule 45A, Ala.R.App. P., we have searched the record for any error that may have adversely affected the appellant's substantial rights and have found none.
The appellant's conviction and sentence to death are due to be, and are hereby, affirmed.
AFFIRMED.
All the Judges concur.